**In the Matter of Edward C. HYERS and Audrey P. Hyers, Debtors.**

**Patricia A. BACON, Plaintiff,**

v.

**Edward C. HYERS and Audrey P. Hyers, Defendants.**

**Bankruptcy No. 85–1119.
Adv. No. 85–264.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 23, 1987.

Cindy Turner, Tampa, Fla., for plaintiff.

Rodney Dillon, Sarasota, Fla., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case, and the matter under consideration is a claim of non-dischargeability, or in the alternative, a claim to bar the discharge of Edward C. Hyers and Audrey P. Hyers, (Debtors). The claims set forth in five different counts are asserted by Patricia A. Bacon (Bacon), the Plaintiff who instituted this adversary proceeding. Bacon's claim in Count I is based on § 523(a)(2)(A) of the Bankruptcy Code and alleges that the debt owed to Bacon by the Debtors is the result of false representations or actual fraud, and therefore, it should be excepted from the protective provisions of the general Discharge by virtue of § 523(a)(2)(A). The claim set forth in Count II alleges identical liability and it is contended that it should be excepted from the protective provisions of the general Discharge because it is the result of a defalcation by the Debtors while acting in a fiduciary capacity, thus, non-dischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. The claim as set forth in Count III alleges that the Debtors, in fact, converted the property of Bacon, therefore, the liability falls within exception to discharge set forth in § 523(a)(6) of the Bankruptcy Code. The claim set forth in Count IV alleges a willful and malicious injury to the property of Bacon and claimed to be non-dischargeable by virtue of § 523(a)(6) of the Bankruptcy Code. In Count V Bacon seeks an order barring the Debtors' Discharge pursuant to § 727(a)(3) and (a)(5) of the Bankruptcy Code alleging in the alternative (1) the Debtors have "failed to keep or preserve appropriate records" *and* (2) the Debtors have failed to explain adequately the loss of certain assets. The facts relevant and germane to a resolution of the controversy as established at the final evidentiary hearing held in this matter are as follows:

Edward C. Hyers (Mr. Hyers) and Audrey P. Hyers (Mrs. Hyers), the Debtors in the above-captioned case, were the sole shareholders of a Florida corporation, American Philatelic Brokers, Inc. (American Philatelic). The corporation was engaged in the business of buying, selling and brokering philatelic materials. Mr.

Hyers was the President, Chief Executive Officer and majority shareholder of American Philatelic and was in full charge of the affairs of the corporation.

The business of American Philatelic was initially conducted out of the Debtors' home located at 8111 Willow Street in Bradenton, Florida, but was later moved to 69 South Palm Avenue in Sarasota, a location where there were some other businesses were located and also operated by the Debtors.

At the time relevant, Bacon was the owner of a collection of foreign and domestic stamps (collected over a period of 40 years by her father) which she had inherited when her father died. In March of 1982 Bacon contacted Mrs. Hyers and discussed the possibility of marketing her stamp collection. On April 13, 1982, a "Private Treaty Sales Agreement" was executed by Bacon and Mr. Hyers as President of American Philatelic (Pl.'s Exh. # 1). This Agreement, which is, in fact, a consignment agreement, identified Bacon as the consignor and states that American Philatelic would undertake to broker Bacon's stamp collection as "agent for the seller." The Agreement also contained a handwritten notation initialled by Mr. Hyers which stated that there would be a "30,000.00 guaranteed minimum realization." (sic) This notation appears on the same line as the words "owner's inventory attached." Bacon delivered to Hyers the stamp collection together with a complete inventory of the stamp collection on April 13, 1982.

American Philatelic made several sales of Bacon's stamps to different collectors and dealers at private sales and auctions between 1982 and 1984. All records of these transactions were located at the 69 South Palm Avenue, Sarasota, Florida, location. It is without dispute that the proceeds from these sales were not segregated by Mr. Hyers and were deposited in the general corporate operating account of American Philatelic. It should be noted, however, that the "Private Treaty Sales Agreement" (Pl.'s Exh. # 1) is silent as to any duty of American Philatelic to segregate any of the proceeds obtained from the sales of the stamps owned by Bacon. Bacon has never received an accounting from American Philatelic on these sales nor did she receive a remittance of any monies obtained by American Philatelic from the sale of her stamps, notwithstanding a specific provision of the Agreement which required a payment to the seller, i.e. Bacon, "within 10 days, or less, after the date on which it is sold."

On July 15, 1983, at a luncheon attended by Bacon, Mr. Hyers and Mrs. Hyers, Mr. Hyers tendered a corporate check to Bacon in the amount of $20,000.00. This amount represented the proceeds of certain sales of stamps left on consignment with American Philatelic by Bacon. The testimony surrounding the tender of this amount by Hyers is disputed. This Court is satisfied that the tender did actually occur in Maitland, Florida, at the residence of Bacon. It is equally clear, however, that the check was never negotiated by Bacon. Bacon declined to accept the check because she was concerned that acceptance of the check would be construed to be a settlement in full of the entire amount due to her from the sales of her stamp collection, or otherwise might adversely affect her ability to claim the full amount due under the consignment agreement. At the meeting in Maitland the parties agreed that Mr. Hyers would hold the $20,000.00 and Bacon agreed that Hyers could use the interest earned on the money to offset his expenses incurred by him in connection with future sales of the remainder of the collection. It is clear, however, that Bacon never authorized American Philatelic or Mr. Hyers to use any portion of the $20,000.00 principal deposited in an interest-bearing account.

On August 18, 1984, Mr. Hyers wrote Bacon a letter which memorialized the oral agreement made on July 15, 1983 (Pl.'s Exh. # 2). The letter in pertinent part states:

> Regarding the matters of monies which we have earned for you. When I was over to see you last year I had $20,000.00 for you. You told me to keep

it [$20,000.00] and use the interest toward my expenses in serving you. I took the liberty of placing it [$20,000.00] in CD's which I have re-newed (sic) recently.

It is clear that Bacon has not received any proceeds for the sales made by American Philatelic and none of the unsold balance of her stamp collection was ever returned to her. There are no records available evidencing the disposition of the $20,000.00 originally held in CD's.

On March 11, 1985, four months later, Miramar Associates, Ltd., a Florida limited partnership, the landlord of American Philatelic, obtained a Distress Writ for rent against American Philatelic and the Debtors were prohibited from removing any property from the premises. It appears that at the time Hyers was served with the Writ of Distress, the remaining unsold portion of the consigned stamp collection of Bacon, together with the books and records of American Philatelic were left on the premises, which included the documents pertaining to the stamp collection of Bacon.

On March 29, 1985, Bacon wrote a letter to Hyers and demanded the return of the following items no later than April 5, 1985:

(a) all monies owed to her from the sale of her collection;

(b) any unsold portion of the collection; and

(c) certain catalogues and other documentation constituting a complete inventory of the collection.

(Pl.'s Exh. # 4).

On May 6, 1985, the Debtors filed a Chapter 7 Petition. No stamps or stamp collections were listed on the schedules filed by the Debtors, either as "property held for another," or otherwise. It is undisputed that no stamps or proceeds therefrom were turned over to Bacon and no accounting was ever furnished. Moreover, the Debtors have offered nothing more than general and vague explanations for the absence of these assets.

William C. Metcalfe (Metcalfe), Bacon's expert witness, testified that the catalogue value of the stamp collection in 1968 was approximately $53,000.00 and approximately $300,000.00 in 1985. Metcalfe arrived at this value by reviewing the inventory attached to the Consignment Agreement and the more detailed handwritten notations inventory made by Bacon's deceased father in the 1968 Scott's Catalogues. (Pl.'s Composite Exh. # 3). Metcalfe then derived an "increased value factor" of 5.58 in order to translate the 1968 catalogue values to 1985 catalogue values. After making this computation Metcalfe stated that the fair market retail value of the collection today would be 75% of the catalogue value for United States stamps and 50% of the catalogue value for foreign stamps. Bacon's collection, according to Metcalfe, was comprised of approximately 40% United States stamps and 60% foreign stamps. As a result of these computations, the retail or market value of Bacon's collection in 1985 was fixed at between $100,000.00 and $150,000.00.

The Debtors' expert witness, Mr. Miller, a professional stamp collector for 30 years, testified that the total catalogue value was $53,781.97 and that the face value was $791.52. Miller testified that the stamp market has been depressed since 1981 and the values have dropped by 50%. Miller also testified that for the period of 1968 to 1984 that 70% of all stamps retained the same value as in 1968. Miller further testified that the actual condition of stamps is a "primary" factor in valuation and it was his opinion that no one could meaningfully value the stamp collection without examining the condition of the stamps.

Bacon testified that at the time her father's estate was administered, a written appraisal was made by Mr. Rogers for the purposes of probating her father's will. This valuation by this expert placed the value of the collection at $25,800.00. Bacon in challenging this valuation contended that the appraisal was low for two reasons: (1) Rogers had a personal interest and wanted to buy the stamp collection himself and made an offer to buy the collection at the appraisal price; and (2) valuation for probate proceedings is generally lower

than other valuations, and therefore, does not represent true value of the property appraised.

These are the basic facts as established at the final evidentiary hearing based on which this court must determine the validity of the several claims set forth by Bacon in her Complaint. It is generally realized that the exceptions to the discharge must be strictly construed, and the burden is placed on the party asserting the non-dischargeability to establish with the requisite degree of proof that the particular debt involved is a non-dischargeable obligation. This is so because the very nature and philosophy of the bankruptcy law traditionally has been that the discharge provisions shall be liberally construed in favor of the debtor in order to achieve the Congressional intent, which was to give financially distressed debtors a fresh start in life. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970) Thus, it is clear that the burden is on the creditor to prove any exception to the Discharge. *In re Danns v. Household Finance Corp.*, 558 F.2d 114, 116 (2d Cir.1977); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986). It is equally clear that the standard of proof imposed on the creditor is that of a clear and convincing evidence. *In re Neumann*, 13 B.R. 128, 130 (Bankr.E.D.Wis.1981); *see also In re Magnusson*, 14 B.R. 662, 667 (Bankr.N.D. N.Y.1981); *In re Guilmette*, 12 B.R. 799, 802 (Bankr.D.R.I.1981); *In re Trewyn*, 12 B.R. 543, 545–46 (Bankr.W.D.Wis.1981). The standard of proof required by a debtor to sustain a claim of non-dischargeability of a particular obligation is equally applicable if not even more to a challenge of a debtor's right to a general bankruptcy discharge. This is so because it is clear that one of the paramount aims of Congress enacting the Code was to grant relief of financially distressed debtors through the bankruptcy Discharge.

■ Of course the initial inquiry must be addressed to the Debtors' right to a general discharge pursuant to § 727(a) of the

Bankruptcy Code, a right which is also challenged by Bacon. Her objection to the discharge of these Debtors is based on § 727(a)(3) and § 727(a)(5) of the Bankruptcy Code respectively. Before discussing her claims based on these sections it should be stated at the outset that there is nothing in this record which would even remotely suggest that Mrs. Hyers had anything to do whatsoever with the transactions between her husband and Bacon, nor that she had any duty whatsoever to maintain any books and records concerning her financial affairs or business transactions. Thus, it is evident that Bacon failed to carry her burden of proof concerning Mrs. Hyers and for this reason her complaint objecting to the discharge of Mrs. Hyers must be dismissed with prejudice.

This leaves for consideration Bacon's claim against Mr. Hyers challenging his right to a discharge. Her claims against Mr. Hyers are also based on the contention that Mr. Hyers failed to keep adequate books and records or failed to satisfactorily explain loss of assets or deficiency of assets to meet his liabilities. Consider her claim first based on § 727(a)(3), it is clear that the requirement of keeping books and records by a debtor from the debtor's financial condition or business transactions might be assertained, is not an inflexible requirement of law. As a matter of fact, the very section includes an escape valve, and specifically provides that the failure to comply with the record-keeping requirements is excused if the act of noncompliance was justified under the circumstances of the case.

■ Even a brief analysis of this claim in light of the facts developed indicates that it cannot be sustained for the following reasons: The alleged absence of books and records are not books and records of the Debtors, Mr. and Mrs. Hyers, but the books and records of American Philatelic, a non-debtor. There is nothing in this record to support the conclusion first that Mr. Hyers had any duty to maintain any books and records concerning his personal financial condition or *his personal business*

*transactions* (emphasis supplied). The fact that American Philatelic did or did not keep any books and records is of no consequence and is without legal significance as far as the Debtors' right to a general discharge is concerned. In addition, tt should be noted that the absence of books and records of American Philatelic were clearly explained because at the time the Writ of Distress was served prohibiting Hyers to access the premises, all the books and records were left on the premises and, therefore, it is not unreasonable to infer that when the landlord retook the premises, it disposed all books and records of American Philatelic. Be that as it may, as noted, the lack of the books and records of the Debtor is of no relevance and, therefore, the claim of Bacon based on this section cannot be sustained.

■ Next, the alternative claim asserted by Bacon, which according to her would warrant a denial of the Debtors' discharge is equally without merit. This claim is based on the contention that the Debtors failed to explain a loss of certain assets, therefore, they are not entitled to a discharge pursuant to § 727(a)(5) of the Bankruptcy Code. It should be noted at the outset that in order to sustain a claim under this Section it is the burden of the Plaintiff to establish with the requisite degree of proof that the Debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; that on the date of filing the voluntary Petition the Debtor no longer had the particular asset, and when called upon to explain its disposition, he was unable to furnish a satisfactory explanation.

It is evident from the foregoing that before a Plaintiff can establish a viable claim under this Section there must be a showing that the asset which was lost was the asset of the debtor and not the asset of someone else. In this instance the claim of Bacon relates to the disappearance of the following: (1) the unsold portion of her stamp collection; (2) the catalogues pertaining to her stamp collection; and (3) her

$20,000.00 which was left with Hyers and put into a CD representing the proceeds of a portion of her stamp collection. It is evident, and it is clear from this record, that none of the missing assets were ever the assets of the Debtors but were the assets of Bacon. This being the case, her claim seeking denial of the Debtors' discharge, based on § 727(a)(5) must also fail and cannot be sustained.

This leaves for consideration her alternative claims of non-dischargeability based on § 523(a)(2)(A), 523(a)(4) and 523(a)(6) of the Bankruptcy Code. The underlying factual basis for these claims all relate, of course, to the alleged loss of her stamp collection, the loss of the proceeds derived from the partial sale of her stamp collection and also the loss of her catalogues left with Mr. Hyers. Considering first the claim was based on § 523(a)(2)(A) of the Bankruptcy Code, it is well to state that to establish a viable claim under this section is the burden of the Plaintiff to establish (1) that the Debtor obtained monies or properties, by a statement which was materially false; (2) that the statement related to the Debtor's financial condition; (3) that it was submitted with the specific intent to deceive; and (4) that the Plaintiff reasonably relied on the statement. *In re Sahadi,* 49 B.R. 954, 956 (Bankr.N.D.Ohio 1985) (*citing In re Goff,* 17 B.R. 564 (Bankr.W.D.Ky.1982)).

■ This record is absolutely devoid of any evidence which would warrant a finding that either Mr. or Mrs. Hyers ever obtained any money or property from Bacon either by false pretenses or false representations concerning their financial condition or by actual fraud at the time Bacon voluntarily entered into the business transaction with American Philatelic concerning the sale of her stamp collection. This being the case, it is evident that her claim based on § 523(a)(2)(A) cannot be sustained. *In re Martin,* 761 F.2d 1163, 1165 (6th Cir.1985); *In re Lineberry,* 55 B.R. 510, 511 (Bankr.W.D.Ky.1985); *In re Cohen,* 47 B.R. 871, 874 (Bankr.S.D.Fla.1985).

■ To sustain the claim on the alternative ground alleged by Bacon, it is clear

that it is the burden of Bacon to establish that there was a fiduciary relationship between the parties initially, that is, at the time she entered into the consignment agreement which was breached by the Debtor. In this case the relationship of the parties was nothing more than a run-of-the-mill commercial transaction created by the consignment agreement. There is nothing in this record which shows that there was any intention between the parties to establish a fiduciary relationship which under this Section arises only when there is an express and formal trust that exists initially between the parties. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Reder*, 60 B.R. 529 (Bankr.D.Minn.1986); *In re Talcott*, 29 B.R. 874 (Bankr.D.Kan.1983). Thus, the claim of fiduciary relationship must arise ab initio from ex contractu, that is, by contract, and not ex malificio, that is as a result of an alleged wrongdoing.

As stated by former Chief Judge Brown in the case of *Angelle v. Reed, et al.*, 610 F.2d 1335 (5th Cir.1980) construing the predecessor of § 523(a)(4), § 17(a)(4) of the Act of 1898:

> "In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the [Bankruptcy Act].... The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act."

*Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236, 238 (1844). There is nothing in the legislative history of § 523(a)(4) of the Bankruptcy Code which would detract from the continuing viability of the law as stated by Judge Brown in *In re Angelle, supra.*

There is no question that in the present instance there was never an express trust created by the consignment contract, and if there was a breach, it certainly was not the result of breach of a fiduciary relationship, but nothing more than a breach of the consignment agreement. For this reason the claim under this Section equally must fail and cannot be sustained.

The last claim of non-dischargeability is based on Count III, which alleges an unlawful conversion of properties, specifically, the unsold portion of the stamp collection and, of course, the $20,000.00 which was put into a CD. This identical claim is also asserted in Count IV, which alleges in the alternative willful malicious injury to property which is supposed to be a separate and distinct count from the conversion count outlined in Count III. Inasmuch as as a matter of law these concepts are identical and overlapping, these two counts will be considered together.

To sustain a claim under § 523(a)(6) of the Bankruptcy Code the Plaintiff must establish with the requisite degree of proof that the Debtor did, in fact, willfuly and maliciously injure property of another, and of course, that would include a conversion of the property of another would be tantamount of a willful, malicious injury to property.

■ Under § 523(a)(6) of the Bankruptcy Code, the word "willful" in this context means "deliberate or intentional" or, in other words, a "deliberate and intentional act which necessarily leads to injury." 3 *Collier on Bankruptcy* ¶ 523.16[1], at 523–111 (15th ed. 1986). Courts have liberally construed this term and require that the debtor intended to do the act which caused the injury even absent proof of a specific intent to injure. *In re Cecchini*, 780 F.2d 1440, 1443 (9th Cir.1986).

"A malicious injury, for purposes of § 523(a)(6), is merely one which is wrongful, done without just cause or is excessive." *In re Goldzweig*, 54 B.R. 229, 233 (Bankr.N.D.Ill.1985). "Malice under 11 U.S.C. § 523(a)(6) does not require a showing of hatred or ill will." *In re Overmyer*, 52 B.R. 111, 120 (Bankr.S.D.N.Y.1985). In summary, malicious means "wrongful, excessive or without just cause; and malice will be found even in the absence of person-

al hatred, spite or ill will." *In re Talcott, supra.*

In order to meet the combined definitions of "willful" and "malicious," it is necessary to show only that the Defendant Debtor(s) were aware that harm would result from their conduct, but proceeded anyway with that knowledge. *In re Gantt,* 56 B.R. 852, 857 (Bankr.E.D.Va. 1985); *In re Stephens,* 26 B.R. 389, 391 (Bankr.W.D.Ky.1983). In the present instance there is hardly any doubt that Mr. Hyers was very well aware that the funds derived from the sale of a portion of Bacon's stamp collection were properties of Bacon and he had no right whatsoever to any of the funds with the exception of an interest earned in a CD pursuant to their agreement. It is equally not difficult to infer from this record that Mr. Hyers did, in fact, appropriate the funds derived from the CD and spent them. Thus, it is clear that he did, in fact, willfully and maliciously injure the property of Bacon at least to the extent of an unauthorized spending of the $20,000.00.

The claim of non-dischargeability under this Section can also be sustained on the theory of conversion.

A conversion is defined as:

Any act of a person in asserting a right of dominion over chattels which is inconsistent with the right of the owner.... any wrongful exercise or assumption of authority over another's goods, depriving him of possession permanently or for an indefinite time, is a conversion.... there are actually three types of conversion: (1) wrongful taking; (2) wrongful withholding where, except for the withholding, no act of conversion is committed; and (3) an act which, though possession was not initially wrongful, is an excercise of dominion amounting to a conversion.

12 *Fla.Jur.2d, Conversion and Replevin,* § 6, at 65–67 (1979).

It is clear under § 523(a)(6) that "the conversion of another's property without his knowledge or consent, done intentionally and without justification or excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception." 3 *Collier on Bankruptcy* ¶ 523.-16[1], at 523–112 (15th ed. 1986); *see also In re Overmyer,* 52 B.R. 111, 120 (Bankr.S.D.N.Y.1985) ("An intentional conversion of property in knowing disregard of the owner's rights will amount to a willful and malicious injury to property within the meaning of 11 U.S.C. § 523(a)(6)."); *In re Talcott,* 29 B.R. 874, 879 (Bankr.D.Kan. 1983) ("This section applies to conversions of collateral, if the debtor's conduct was willful and malicious."); *In re Ricker,* 26 B.R. 862, 863 (Bankr.E.D.Tenn.1983) (A "willful and malicious injury" covers a "willful and malicious conversion.")

In his defense, Mr. Hyers claims that the Distress Writ prevented him from entering his former place of business, American Philatelic, and as a result could not provide a final accounting of funds or inventory that remained in American Philatelic's corporate premises. This defense is feeble at best for the following reasons:

American Philatelic stopped commercial transactions in October of 1984. The Distress Writ, however, was not served until March 11, 1985, over four months later. Hyers has not adequately explained the failure to turn the remainder of Bacon's collection to her during this four-month period. Therefore, Bacon has carried her burden on Count III as to Mr. Hyers and the debt of $25,800.00 is also a non-dischargeable debt provided that Mr. Hyers could be personally held liable for the unauthorized disposition of the funds and the unsold portion of the stamp collection and the catalogues.

One final issue must be addressed by this Court with respect to the § 523(a)(6) actions. It has been established that Mr. Hyers' actions were willful and malicious. The question remains whether Mr. Hyers is personally liable for such acts. Generally officers and directors of a corporation are not liable for the debts of the corporation, but they are liable to the extent that their participation in the commission of a tor-

tious act results in some harm to a third party and causes them to be liable to a third party. *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987) (per curiam); *Citronelle-Mobile Gathering v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980). This doctrine does not depend upon the same grounds as piercing the corporate veil, *e.g.*, inadequate capitalization, use of corporate form for fraudulent purposes, or failure to comply with formalities of organization. The officer or director is liable as an actor, not an owner. *L.C.L. Theatres, Inc. v. Columbia Pictures Ind., Inc.*, 619 F.2d 455 (5th Cir.1980); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978).

It is clear from the evidence that Mr. Hyers caused the injury to Bacon by the conversion of her property. Thus, Mr. Hyers is personally liable for the resulting injury to Bacon not because of his official position with American Philatelic as the majority stockholder and president, but because of his participation in the conversion of Bacon's property.

Based on this record, this Court is satisfied, however, that none of the claims asserted by Bacon in her Complaint established the requisite degree of proof that there is any legal basis whatsoever first to hold Mrs. Hyers liable to Bacon, and second, in any event, even if so, that such liability could be declared to be non-dischargeable under any of the sections asserted by Bacon in her Complaint against Mrs. Hyers.

A separate final judgment will be entered in accordance with the foregoing.