In re Joseph W. DUNCAN and Bonnie S. Duncan, Debtors.

CHRISTOPHER'S ARIZONA TRANS-PORTATION SERVICE, INC., Plaintiff,

v.

Joseph W. DUNCAN, Defendant.

Bankruptcy No. 91–13047–8P7.

Adv. No. 92–41.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 22, 1993.

R. John Cole, II, Sarasota, FL, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case and the matter under consideration is the dischargeability of a debt admittedly due and owing by Joseph W. Duncan (Debtor) to Christopher's Arizona Transportation Service, Inc. (CATS). CATS brought the claim of nondischargeability in a four (4) Count Complaint. The claims of nondischargeability are based on § 523(a)(2) (Count I), § 523(a)(4) (Count II), and § 523(a)(6) (Counts III and IV) of the Bankruptcy Code. The facts relevant to this claim of nondischargeability, as established at the final evidentiary hearing, are as follows:

At the time relevant, the Debtor was the President of Duncan Aircraft Sales of Florida, Inc., (DASF) and Christopher E. Mullen, Jr. was the President and sole shareholder of CATS. It should be noted that DASF is a corporate Debtor in a separate pending Chapter 7 liquidation case and is not a party in this adversary proceeding. The claims set forth in CATS' Complaint arise from two (2) separate transactions with DASF involving two (2) different airplanes. The first transaction, which is the subject of Count IV, involves a used Cessna Citation II executive size jet aircraft. The second transaction, the subject of Counts I, II, and III, involves the acquisition of a BAC 1–11 by CATS from DASF. For the sake of clarity, it should be helpful to deal with the respective transactions and the corresponding claims set forth in Counts I, II, III and IV in chronological order.

### CESSNA CITATION II

Sometime prior to May, 1986, DASF sold a used Cessna Citation II executive size jet aircraft to CATS. The sale included a "reworking" of the aircraft, which included the removal of various avionics and the installation of new avionics in the aircraft. In addi-

Hywel Leonard, Tampa, FL, for plaintiff.

tion, DASF agreed to return all of the equipment removed from the Cessna to CATS. In May 1986, CATS delivered the Cessna to DASF for the necessary modifications. The modifications were completed and the Cessna was returned to CATS. It is without dispute, however, that DASF failed to return certain equipment removed from the Cessna, i.e. a global navigation system (GNS) worth approximately $50,000.00 and a radar system with miscellaneous control heads worth approximately $25,000.00.

There is no dispute that these parts were the property of CATS. The Debtor admitted that he knew that both the GNS and radar system were part of the Cessna when it was delivered to the DASF facility in Venice, Florida, and that Kirk Newman, an employee of DASF, later sold those parts after they were removed from the airplane. The Debtor also knew that the proceeds from the sale of those parts were deposited into the DASF general account and utilized in the day to day operations of the business and were not remitted to CATS.

## BAC 1–11

The second transaction involved the claims set forth in Counts I, II, and III of the Complaint relating to the acquisition of a BAC 1–11 by CATS from DASF. The historical background of this transaction, appearing from the record, reveals that Mr. Mullen was interested in starting a charter airplane business to transport prominent athletic teams and celebrities. Mr. Mullen contacted Kirk Newman at DASF and asked him to locate an airplane for that purpose. DASF located a BAC 1–11, obtained financing, and purchased the plane with the intention of later selling it to CATS. (Plaintiff's Exh. 48). The Debtor and CATS agree that the above stated facts are accurate, however, what happened thereafter is in serious dispute.

The Debtor claims that DASF and CATS entered into an *oral* sale and purchase agreement whereby CATS orally agreed to purchase the BAC 1–11 aircraft from DASF. Mr. Mullen, on the other hand, claims that there was merely an *oral* lease with the option to purchase the aircraft at a later date. It is undisputed, however, that the BAC 1–11 was delivered to CATS and CATS used the aircraft accruing approximately 220 flying hours. It is also without dispute that CATS paid DASF $40,000.00 for a repurchase inspection; $100,000.00 to cover the interest payments on DASF's loan to purchase the BAC 1–11; and $500,000.00 as a deposit toward the purchase of the BAC 1–11.

Sometime in 1987, Mr. Mullen notified the Debtor that he would not exercise his option to purchase the plane and requested the refund of his deposit money, $500,000.00. DASF refused to return the deposit having taken the position that it was entitled to keep the $500,000.00 under the oral sale and purchase agreement mentioned earlier. In order to resolve the dispute, the Debtor flew to Tucson and met with Mr. Mullen in December 1987. The meeting resulted in a second agreement between DASF and CATS, which was ultimately reduced to writing and executed on December 16, 1987. (Second Agreement) (Plaintiff's Exh. 6). Pursuant to this Second Agreement, which superseded any prior agreements, the parties agreed to undertake the following responsibilities to upgrade the machinery. DASF was to arrange for the installation of a new interior in the aircraft, refurbish the aircraft, and ultimately resell the BAC 1–11. CATS agreed to purchase and install hushkits and pay for the painting of the aircraft. When the refurbished aircraft was sold, CATS and DASF agreed to equally divide any profits from the sale.

Pursuant to the Second Agreement, DASF flew the aircraft to Fairhope, Alabama, to a facility owned and operated by Fairhope Aero, Inc. (Fairhope Aero), where the interior of the plane was removed. DASF engaged the services of Fairhope Aero, an entity not affiliated with DASF, to develop a new interior for the BAC 1–11. (Plaintiff's Exh. 115). After the interior of the BAC 1–11 was removed by Fairhope Aero, the aircraft was flown to Texas where the hushkits were installed at the approximate cost to CATS of $500,000.00. The airplane was also painted, although CATS neither received a bill nor paid for the paint job. The aircraft was then returned to Fairhope Aero to complete the

interior renovations. It is without dispute, however, that Fairhope Aero did not install a new interior. It merely reinstalled the old interior, including the royal throne which was installed while the BAC 1–11 was owned by an Arab Prince.

Meanwhile, the Debtor entered into negotiations concerning the sale of the BAC 1–11 with Mark Foulkrod, acting as agent for Coralco Corporation, a corporation in which Sylvester Stallone was the principal shareholder. As a result of the negotiations between the Debtor and Foulkrod, DASF entered into an Aircraft Purchase Agreement to sell the BAC 1–11 to Coralco for $3,500,-000.00 on April 26, 1988. (Plaintiff's Exhibit 85). It is without dispute that DASF received the proceeds from the sale of the BAC 1–11, but failed to pay CATS any of those proceeds. The Debtor testified that $100,-000.00 was paid to Mark Foulkrod, procuring agent, as a commission, and the remaining $3,400,000.00 was used to pay off the loan obtained by DASF to purchase the plane.

### PROCEDURAL BACKGROUND

On the same day DASF entered into the contract to sell the BAC 1–11 to Coralco, CATS filed an action against the Debtor in the United States District Court in Arizona for breach of contractual obligations arising out of DASF's failure to refurbish the interior of the BAC 1–11. During the course of the District Court Case, by an Order dated June 5, 1989, the Court held that the Second Agreement between the parties dated December 16, 1987, was a valid contract and was not the subject of "economic duress" which would defeat its enforceability. (Plaintiff's Exh. 128). The District Court also concluded that since the Second Agreement related to and completely covered the same subject matter as the original oral agreement regarding the BAC 1–11, based on the doctrine of novation, the original agreement was superseded by the Second Agreement.

On the eve of the District Court trial, both DASF and the Debtor filed petitions for relief under Chapter 11 and Chapter 7 of the Bankruptcy Code, respectively. On an emergency basis, the automatic stay was lifted to allow CATS to liquidate the claim against the

Debtor. Before the trial, CATS and the Debtor stipulated to a $1,500,000.00 personal judgment in favor of CATS.

On January 21, 1992, CATS commenced the present adversary proceeding by filing a four (4) Count Complaint objecting to the dischargeability of the debt due and owing by the Debtor to CATS. Pursuant to § 523(a)(2)(A), the claim in Count I is based on the allegation that the Debtor made false representations concerning the refurbishing of the interior of the BAC 1–11, and CATS detrimentally relied on those representations. Pursuant to § 523(a)(4), the claim in Count II is based on the allegation that the Debtor owed a fiduciary duty to CATS in relation to the renovations, and because of the Debtor's failure to complete those renovations, he committed fraud, defalcation or embezzlement while acting in that fiduciary capacity. Pursuant to § 523(a)(6), the claim in Count III is based on the allegation that the Debtor willfully and maliciously injured CATS when he converted the sale proceeds without remittance to CATS. Lastly, pursuant to § 523(a)(6), the claim in Count IV is based on the allegation that the Debtor willfully and maliciously injured CATS when he converted the GNS and radar system which belonged to CATS.

### COUNT IV

■ In Count IV, CATS has asserted a claim for conversion relating to the Debtor's failure to return certain Cessna parts to CATS pursuant to § 523(a)(6). Section 523(a)(6) of the Bankruptcy Code provides in pertinent part as follows:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

To prevail under § 523(a)(6), a Plaintiff must prove that the Debtor did commit willful and malicious injury against the Plaintiff. The term "willful" has been defined as "deliberate and intentional." *In re Scotella,* 18 B.R. 975 (Bankr.N.D.Ill.1982); *In re Keene,* 135 B.R. 162 (Bankr.S.D.Fla.1991). For the act to be

malicious, it must result in an injury arising from a willful act done wrongfully and without just cause or excuse. See *In re Greer*, 21 B.R. 763 (Bankr.D.Ariz.1982).

■ This Section, unlike its predecessor, § 17(a)(2), does not include any reference to willful and malicious conversion of property of another. There is no question, however, that the § 523(a)(6) exception includes conversion. *Security Bank of Nevada v. Singleton*, 37 B.R. 787 (Bankr.D.Nev.1984). Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the alternative or exclusion of the owner's rights. *Goodrich v. Malowney*, 157 So.2d 829 (Fla.App.1963); *Catania v. Garage De Le Paix, Inc.*, 542 S.W.2d 239, 241 (Tex.Civ.App. 12 Dist.1976).

■ It is undisputed that the GNS and radar system, which were the property of CATS, were removed from the Cessna at the time it was refitted with new avionics and were never returned to CATS despite repeated demands. It is also undisputed that the Debtor and DASF exercised control over the spare parts once the Cessna was delivered to DASF for the modifications. Based on these facts, there is hardly any doubt that the spare parts described earlier were converted, albeit they were not necessarily converted solely by the Debtor. Even if this Court is willing to accept the Debtor's argument that, although he had ultimate authority as president of DASF, he was not in charge of the daily operations of the business and, therefore, the cost of the missing avionics, approximately $75,000.00, was not his responsibility, this Court is unwilling to accept his alleged claim of innocence. This record clearly supports the finding that he should be charged with the conversion of the parts involved. The Debtor knew the parts belonged to CATS, he knew they were supposed to be returned to CATS, he knew they were never returned, and he knew they were taken to the DASF facility in Venice, Florida. The fact that one of his employees performed the actual sale of the parts is of no consequence. It is well recognized law that, generally, officers and directors of a corporation are not liable for the debts of the corporation, but they are liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to a third party. *See, e.g., Matter of Hyers*, 70 B.R. 764 (Bankr.M.D.Fla.1987); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987) (per curiam); *Citronelle–Mobile Gathering v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980). An officer or director of a corporation may be held to be liable as an actor and not as a corporate officer. *Matter of Hyers, supra.* In sum, the debt owed by the Debtor to CATS in the approximate amount of $75,000.00 for the Cessna parts should be excepted from the overall protection of the general discharge pursuant to § 523(a)(6). This leaves for consideration the remaining claims set forth in Counts I, II and III of the Complaint.

## COUNT I

■ In Count I, CATS alleges that the judgment owed by the Debtor to CATS should be declared nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code, which states:

§ 523. Exceptions to Discharge.

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Specifically, CATS alleges that the Debtor falsely represented his intention to refurbish the interior of the BAC 1–11 in the Second Agreement signed by both parties on December 16, 1987. This Court is satisfied, however, that CATS failed to present persuasive evidence to prove a viable claim under § 523(a)(2)(A) of the Bankruptcy Code. For a debt to be deemed nondischargeable pursuant to § 523(a)(2)(A), the Debtor himself must obtain the money, property, services, or an extension, renewal, or refinancing of credit by misrepresentation, false pretenses or actual fraud. See *In re Chavez*, 140 B.R. 413, 420 (Bankr.W.D.Tex.1992); *In re Bur-*

*gess,* 955 F.2d 134, 140 (1st Cir.1992); *In re Rifkin,* 142 B.R. 61 (Bankr.E.D.N.Y.1992); *In re Jacobs,* 54 B.R. 791 (Bankr.E.D.N.Y. 1985). Inasmuch as the Debtor never individually received any money, property, services, or an extension, renewal, or refinancing of credit from CATS, this Court is satisfied that it is appropriate to conclude that the debt owed by the Debtor to CATS is dischargeable and not excepted from the general discharge based on § 523(a)(2)(A). While the Debtor may have breached the Second Agreement by failing to complete the refurbishment of the BAC 1–11 aircraft, this is insufficient in and of itself to establish a viable claim of nondischargeability under § 523(a)(2)(A).

## COUNT II

■ In Count II of the Complaint, CATS contends that the consent judgment against the Debtor should be declared nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code, which provides that:

§ 523. Exceptions to Discharge.

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

To prevail on the claims of nondischargeability based on § 523(a)(4), the Plaintiff had the burden to establish that (1) the Debtor was acting in a fiduciary capacity; and (2) while acting in a fiduciary capacity, the Debtor committed either fraud or defalcation or was guilty of embezzlement or larceny. If both of these elements are established, the liability will be excepted from the overall protection of the general discharge pursuant to § 523(a)(4). CATS alleges that the Debtor failed to account for or pay the proceeds to CATS of the sale of the BAC 1–11 and he acted in a fiduciary capacity in connection with this transaction. In addition, CATS claims that the Debtor took proceeds after paying off the mortgage on the airplane which constitutes embezzlement.

■ At the conclusion of CATS' case, this Court dismissed Count II because the proof presented by CATS failed to establish a fiduciary relationship between the parties. Likewise, there was no evidence sufficient to warrant the finding that the Debtor was guilty of embezzlement. Notwithstanding, this Court agreed to reconsider this issue and granted leave to the parties to submit case law on this issue. Upon review of submitted case law, this Court is still satisfied that there was never a fiduciary relationship between CATS and the Debtor.

Recently, the 11th Circuit Court of Appeals affirmed the District Court for the Northern District of Georgia, in the case *Quaif v. Johnson,* 4 F.3d 950 (11th Cir.1993), concluding that a fiduciary duty can be created by statute in addition to an express or technical trust created by contract.

CATS has clearly failed to establish that any trust instrument was in existence between the parties. A review of Plaintiff's Exh. 6 shows that there was merely an agreement between the parties to refurbish an airplane for future resale. There is no language in the document creating a trust by contract, nor is there a Statute like the one involved in *Quaif* which established a fiduciary relationship between the Debtor and the Plaintiff. Therefore, this Court is satisfied that it is appropriate to dismiss the claim of CATS of nondischargeability based on § 523(a)(4).

## COUNT III

The claim in Count III of the complaint is based on the allegation that the Debtor, in selling the BAC 1–11 to Coralco without distributing to CATS its share of the proceeds, is guilty of conversion which resulted in a willful and malicious injury to CATS. Specifically, CATS claims it is entitled to approximately $572,000.00 in damages based on the fact that DASF disbursed monies differently then was called for in the Second Agreement. The Debtor, on the other hand, contends that the Second Agreement is merely a contract between two corporations, CATS and DASF, and the Debtor only acted as the president of DASF, not in his individual capacity.

■ Upon review of the record, this Court is satisfied that a conversion of pro-

ceeds did in fact occur. According to the Second Agreement, the proceeds from the sale of the BAC 1–11 were to be disbursed as follows:

(1) Chase bank gets paid off;

(2) Cost of interior gets reimbursed to DASF;

(3) CATS gets hushkit expense plus installation reimbursement;

(4) CATS gets paint expense reimbursed;

(5) Interest expense to be reimbursed to DASF;

(6) Reimburse for CATS deposit and lease payment;

(7) Additional profit divided equitably between DASF and CATS. At sale of BAC, CATS is paid in cash. If aircraft leased on 125 certificate, expenses will be paid by moneys taken in and balance in excess will be escrowed. (Plaintiff's Exh. 6) (sic).

It is without dispute that the $3,500,000.00 received from Coralco was disbursed by DASF in the following manner: (1) $2,750,-000.00 representing the principal balance of the Promissory Note and an additional $167,-268.95 in interest, for a total of $2,917,268.95 paid to Chase Bank; (2) $105,000.00 to Mark Foulkrod as a commission for acting as the procuring agent for the sale to Coralco; and (3) reimbursement of $54,278.60 to DASF for the painting of the aircraft, an expense that CATS had previously agreed to pay but did not. (Plaintiff's Exh. 91). Although the payment of a commission for the procuring agent was not specifically designated in the Second Agreement, this Court is satisfied that it is customary to pay such a commission upon the sale of an aircraft. Accordingly, this Court is satisfied that these three payments were appropriate.

 After deducting these payments from the purchase price, this left $423,452.45 available to be divided between DASF and CATS. However, rather than reimburse CATS for the purchase and installation of the hushkits and its deposit money, the Debtor authorized the disbursement of the remaining money on various costs associated with the BAC 1–11 during its ownership by DASF. Specifically, the Debtor claims that the money was spent on parts, repairs, fuel,

travel, food, lodging, pilot fees, document and title fees, insurance and "miscellaneous" costs associated with the upkeep of the aircraft while it was owned by DASF. (Plaintiff's Exh. 91). This Court is satisfied that these disbursements were improper and should have instead been distributed to CATS to partially reimburse it for the purchase and installation of the hushkits and for its deposit as required by the Second Agreement.

Based on this record, this Court is satisfied that the Debtor is personally liable for the conversion of these funds because he authorized the improper disbursement. Therefore, the sum of $423,452.45 due and owing to CATS from the Debtor is deemed nondischargeable pursuant to § 523(a)(6).

A separate final judgment will be entered in accordance with the foregoing.

DONE AND ORDERED.