**In re Kathleen A. NAIMO, Debtor.**

**SEARS, ROEBUCK AND CO., Plaintiff,**

**v.**

**Kathleen A. NAIMO, Defendant.**

**Bankruptcy No. 94–12821DAS.**
**Adv. No. 94–0591DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 20, 1994.

Rhonda Brownstein, Philadelphia, PA, for debtor.

Charles J. Phillips, Baskin Liesawitz Heller & Abramowitch, P.C., Wyomissing, PA, for plaintiff.

Michael Kaliner, Trustee, Fairless Hills, PA.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

This proceeding presents the issue of whether the Debtor herself must have obtained property by false pretenses, false representation, or fraud in order to have a debt declared non-dischargeable on the basis of 11 U.S.C. § 523(a)(2)(A). We agree with those cases which do not confine § 523(a)(2)(A) to instances where a debtor receives a direct benefit from such actions.

Nevertheless, we hold that the instant Plaintiff has failed to prove that the Debtor, who allowed to the use of her credit cards from the Plaintiff to finance what she erroneously believed were temporary monetary needs of her fiancé, knew or should have known that her representations to pay were false, or that she made them with the intention and purpose of deceiving the Plaintiff.

### B. FACTUAL AND PROCEDURAL HISTORY

KATHLEEN A. NAIMO ("the Debtor") filed a voluntary Chapter 7 bankruptcy case on May 5, 1994. On September 20, 1994, SEARS, ROEBUCK AND CO. ("the Plaintiff") filed an adversary proceeding challenging the dischargeability of the Debtor's indebtednesses to it on two separate charge accounts. On the first account, a general revolving charge account, two camcorders, two VCR's, and a television set, at amounts totalling $3,402.55, were purchased in the Debtor's name between July 10, 1993, and August 2, 1993. When the Debtor made the requisite minimum payments on this account for several months, she was allowed to open another type of charge account with the Plaintiff generally restricted to "big ticket" purchases. Between December 10, 1993, and December 12, 1993, two more camcorders and three more VCR's were purchased on this account in the Debtor's name, at an additional total price of $3,809.56.

The Debtor admitted that she had stated, on her application for the initial charge account, opened on July 1, 1993, that she was employed. However, she had in fact been laid off in February, 1993, from her job of the previous eight years, although her unemployment compensation benefits ($540 biweekly) almost equalled her salary ($630 biweekly).

The Debtor testified that the opening of the accounts in issue and her strange buying habits were attributable to her relationship with one Robert Brown ("Brown"). She testified that she had known Brown since 1983 and believed that he was well-off financially from income earned as the owner of vehicle transmission repair businesses. In early 1993 she and Brown altered their apparently casual relationship and decided to be married.

In June 1993, several months after this decision, Brown advised the Debtor that his considerable assets were "frozen" and that he needed immediate monetary advances to make payments for the release of these assets. The Debtor, who testified that she had accumulated impeccable credit ratings and certain liquid assets over the past several years, gradually contributed all of her own assets, which she valued between $10,000 and $15,000, to assist Brown. When these were exhausted, she agreed to open the charge accounts in question with the Plaintiff and allow Brown to utilize her credit cards to purchase the electronic goods in issue for resale to generate further cash for him to release his accounts.

The Debtor further testified that, when she made the charges in issue, she believed that Brown would, within a very short time period, obtain the release of his accounts and repay her, in which case she in turn would pay off the Plaintiff. However, when Brown was arrested for a bank robbery later in December 1993, she learned that Brown had been utilizing the liquid assets she had made available to him to repay loan sharks. She still believes that Brown has considerable

assets tied up somewhere which can be tapped to repay her and the Plaintiff, but she testified that, as of May 1994, she realized that repayment would not be voluntarily and readily forthcoming from Brown. She then chose to file bankruptcy.

The Debtor delivered her testimony with considerable emotion. The Plaintiff's counsel, who had apparently taken her pre-trial deposition, conceded that the Debtor's recitation was highly credible, and no evidence tending to rebut any aspect of it was presented. Nevertheless, the Plaintiff contends that the debts are nondischargeable because (1) the Debtor admittedly falsified her employment status in applying for its credit; (2) the Plaintiff had "a right to know" the undisclosed fact that the Debtor was not purchasing the items in issue for ordinary consumer purposes; (3) the Debtor had no reasonable hope of repayment, similar to the mindset of a gambler whose only hope of repayment is the unlikely prospect of winning, citing *In re Clagg,* 150 B.R. 697, 699–700 (Bankr.C.D.Ill. 1993) (collecting cases which have almost uniformly been unsympathetic to gamblers); and (4) although the Debtor did not directly benefit personally from the credit advances in issue, such benefit is not a prerequisite in a § 523(a)(2)(A) proceeding.

The Debtor countered with the following arguments: (1) proof of the Debtor's personal benefit from the credit advanced *was* necessary; all she received was "financial remuneration, humiliation and great emotional pain and suffering" from her relationship with Brown, including these events; and (2) assuming *arguendo* that the Debtor did somehow benefit from the instant credit advances, she reasonably believed that Brown would repay her and she would be able to repay the Plaintiff until after all of the purchases in issue were made.

## C. DISCUSSION

### 1. WE AGREE WITH THE MAJORITY VIEW THAT § 523(a)(2)(A) DOES NOT REQUIRE A DEBTOR TO BENEFIT PERSONALLY TO RENDER A DEBT NON–DISCHARGEABLE UNDER THAT CODE SECTION.

Code § 523(a)(2)(A) reads as follows:

(a) A discharge under section 717, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

■ A respectable array of courts have held that this language provides that the property received by means of fraud must be "obtained by" the debtor personally to render § 523(a)(2)(A) applicable, even in circumstances far less palatable, from the debtor's standpoint, than those of the instant proceeding. *See In re Duncan,* 162 B.R. 905, 910–11 (Bankr.M.D.Fla.1993) (president of company who misrepresented his company's conversion of airplane parts allegedly purchased on behalf of the defrauded creditor); *In re Bilzerian,* 162 B.R. 583, 589–90 (Bankr.M.D.Fla. 1993) (principal of investment company convicted of fraud upon creditors); *In re Rifkin,* 142 B.R. 61, 64 (Bankr.E.D.N.Y.1992) (president of advertising and promotional firm which defrauded its client); *In re Cohen,* 69 B.R. 9, 11 (Bankr.E.D.N.Y.1986) (debt of investment counsellor who defrauded a customer was found nondischargeable only to the extent of the debtor's personal commissions earned thereby); *In re Jacobs,* 54 B.R. 791, 793 (Bankr.E.D.N.Y.1985) (certified public accountant who pleaded guilty to criminal charge of filing false financial statements to deceive customers); and *In re Wade,* 43 B.R. 976, 982 (Bankr.D.Colo.1984) (indebtedness of investment counsellor who defrauded customers was found nondischargeable under only 11 U.S.C. § 523(a)(4) and not § 523(a)(2)(A)).

With all due respect to these courts, we perceive nothing in the language of § 523(a)(2)(A) which states that the debtor must *personally* obtain the property in issue by fraud to suffer non-dischargeability for

the debtor's obtaining property on this basis. The word "obtained" obviously is included in § 523(a)(2)(A), but it appears to us to relate to the fact that the property must be obtained from the creditor to trigger applicability of § 523(A)(2)(A). The view that the debtor need not personally obtain the property in issue is expressed at some length, and we think accurately, in *In re Mones*, 169 B.R. 246, 250–54 (Bankr.D.D.C.1994). *Accord, In re Langworthy*, 121 B.R. 903, 906–07 (Bankr. M.D.Fla.1990); *In re Chaney*, 109 B.R. 214, 216 (Bankr.N.D.Tex.1989); *In re Tom Woods Used Cars, Inc.*, 23 B.R. 563, 569 (Bankr. E.D.Tenn.1982). *Cf. In re Kunkle*, 40 F.2d 563 (E.D.Mich.1930) (Act case).

It is true that our reading of § 523(a)(2)(A) makes it easier for creditors to challenge dischargeability of their debts and that making this task easier for creditors is contrary to the principle that exceptions to dischargeability should be construed narrowly. *See, e.g., Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); and *Mones, supra*, 169 B.R. at 252. However, as our subsequent analysis of the unusual facts of this case will reveal, the well-established criteria which a creditor must satisfy to succeed in a § 523(a)(2)(A) case are already quite formidable. It will not do to add requirements that are not within the scope of these criteria, nor, more importantly, within the scope of the crucial Code language itself, just to make it more difficult for creditors to prevail in dischargeability proceedings.

We therefore decline to rule in favor of the Debtor on the ground that the proceeds of the property obtained from the Plaintiff went exclusively to Brown and not to her, even though we find these facts more compelling than those of any of the cases where benefit to the debtor was found a prerequisite recited at page 880 *supra*.

We also note that the Debtor obviously perceived some personal benefit, albeit indirect, from her actions. She hoped to marry Brown. Helping him overcome what she believed was a temporary financial crisis not only would serve to prove her a faithful

partner at a time of crisis, but it would conceivably help to release his assets and thereby benefit her own future financial security as Brown's wife.[1]

2. *THE DEBT IN QUESTION IS NEVERTHELESS DISCHARGEABLE BECAUSE THE PLAINTIFF HAS NOT PROVEN THAT THE DEBTOR MADE KNOWINGLY FALSE REPRESENTATIONS TO REPAY IT NOR THAT SHE MADE ANY SUCH REPRESENTATIONS WITH THE INTENTION AND PURPOSE OF DECEIVING THE PLAINTIFF.*

As this court stated in *In re Cirineo*, 110 B.R. 754, 757 (Bankr.E.D.Pa.1990):

It is well-established that

in order to succeed in a claim under § 523(a)(2)(A), the Plaintiffs were obliged to

"establish all of the following elements by the demanding standard of 'clear and convincing evidence:'

(1) that the debtor made the representation;

(2) that at the time he knew they were false

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relief [relied] on such representations;

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made."

*In re Bergman*, 103 B.R. 660, 671 (Bankr.E.D.Pa.1989), quoting *In re Stelweck*, 86 B.R. 833, 846 (Bankr.E.D.Pa. 1988), *aff'd sub nom. United States v. Stelweck*, 108 B.R. 488 (E.D.Pa.1989); and [*In re*] *Fitzgerald, supra*, 73 B.R. [923,] at 926 [ (Bankr.E.D.Pa.1987) ]. *See also In re Woods*, 66 B.R. 984, 988 (Bankr.E.D.Pa.1986); *In re Gelfand*, 47 B.R. 876, 879 (Bankr.E.D.Pa.1985); and

---

1. Thus, if the Debtor has assisted Brown in his bank robbery, or forged a stolen credit card for him, it is doubtful that she could plead her

"shared victimization" as any sort of defense to a criminal proceeding or a non-dischargeability proceeding.

**882**

*In re Brackin,* 23 B.R. 984, 985 (Bankr. E.D.Pa.1982).

Although we must point out that the decision in *Grogan v. Garner,* 498 U.S. 279, 282–89, 111 S.Ct. 654, 656–61, 112 L.Ed.2d 755 (1991), alters the standard of proof of the five above-referenced criteria from "clear and convincing evidence" to a "preponderance of the evidence," the criteria themselves remain intact. *See, e.g., In re McDonald,* 177 B.R. 212, 215 (Bankr.E.D.Pa.1994) (Raslavich, J.); *In re Chryst,* Bankr. No. 92–23776DWS, Adv. No. 93–2055, slip op. at 7, 1994 WL 760583 (Bankr.E.D.Pa. Oct. 3, 1994) (Sigmund, J.); *In re Weinstock,* Bankr. No. 88–21881T, Adv. No. 80–0424, slip op. at 5, 1994 WL 757707 (Bankr.E.D.Pa. Sept. 28, 1994) (Twardowski, J.); and *In re Kaplan,* 162 B.R. 684, 701–02 (Bankr.E.D.Pa.1993).

▮ In a credit card case, the Debtor's use of the card, particularly where, as here, the cards were subscribed to by the Debtor, represents an implied promise to repay the card issuer. *Cirineo, supra,* 110 B.R. at 758. However, in order to prevail in this § 523(a)(2)(A) proceeding, the Plaintiff was obliged to establish that the Debtor knew or at least should have known that she could not repay the sums charged on the cards, and that therefore the cards' usages were accomplished with the intent and purpose of deceiving the Plaintiff.

The Plaintiff's first of its four arguments, set forth at page 880 *supra,* is that the Debtor's misrepresentation of her employment status is at least one element of her fraud. However, the Plaintiff failed to present evidence that a change in the disclosure of the Debtor's employment status would have in fact changed its decision to issue the first card. And the second card's issuance resulted simply because she was current in payments on the first card. Furthermore, whether this misinformation was intentional and purposeful must be viewed from the Debtor's perspective. Her unemployment compensation almost matched her employment income. She had hopes of re-employment. More importantly, she expected Brown rather than herself to repay these debts when he became her husband and the couple's chief breadwinner. Therefore, her financial status was, in her view, not very significant. It is very difficult to attribute knowing falsehoods and an intention and purpose to deceive on her part from these misstatements in light of these facts.

▮ The second argument of the Plaintiff regarding the Debtor's alleged duty to inform it of her very unusual motivations for utilizing the cards is, frankly, difficult for us to fathom. There is no evidence that a customer has any duty to tell a retailer what use the customer intends to make of products purchased with the retailer's credit cards. To the extent that the Debtor's buying patterns were unusual, we note that they might have prompted suspicion and inquiry on the part of the Plaintiff's salespersons. We know of no duty of a retailer to sell just any items to a customer on credit. An inquiry might have been in order in this instance, but none was apparently made. There does not appear to be any duty on the part of the Debtor to volunteer such information.

While we agree with the Plaintiff as to its fourth argument that the Debtor need not have benefitted directly for it to prevail, *see* pages 880–81 *supra,* it can nevertheless prevail in this proceeding only if it succeeds in at least one of its alternative arguments. The third, and remaining, additional argument of the Plaintiff regarding the reasonability of the Debtor's expectation that Brown would repay her and, ultimately, it as well, is the critical issue in this case.

The Plaintiff was obliged to establish, by a preponderance of the evidence, that the Debtor knew or should have known that Brown was unlikely to make good on his promises of repayment to her, thus allowing her to repay the Plaintiff. Proof of this element (the second of five general § 523(a)(2)(A) criteria) is always difficult for a creditor to accomplish. That is why it is difficult for creditors to win § 523(a)(2)(A) cases. The height of this hurdle cannot be lowered too far from a "should have known" situation to a "could have known" situation. We do allow that gambling, even when rendered addictive by mental illness, is one situation where we, with most other courts, have recognized that a debtor should know that winning and repayment are unlikely, despite an obvious intention to win and repay. *See*

*In re Pascoe,* 1994 WL 636496 (Bankr. E.D.Pa. Nov. 9, 1994). Others exist. For example, in *In re Mistry,* 77 B.R. 507 (Bankr.E.D.Pa.1987), *aff'd sub nom. Writer v. Mistry,* C.A. No. 87–6466 (E.D.Pa. Feb. 9, 1988), we placed the debtor's investment of his friend's savings in the volatile commodities trading market in the same category as gambling with the funds in issue. The debtor obviously hoped to successfully invest the money and repay his friend. However, what was critical in that case was the debtor's deception of his fiscally-conservative friend regarding the nature of the investments. As noted in our disposition of the Plaintiff's second argument here, at page 882 *supra,* the nature and purpose of the purchases in question is not really an issue.

As in *Mistry, supra,* 77 B.R. at 510, 512–13, what is usually critical in § 523(a)(2)(A) cases is the debtor's general credibility. *See In re Butler,* 86 B.R. 829, 831 (Bankr.E.D.Pa. 1988) ("disposition of dischargeability complaints turns largely on the credibility of the parties"), citing *Mistry, supra;* and *In re Somerville,* 73 B.R. 826, 833, 837, 838 (Bankr. E.D.Pa.1987). Here, as the Plaintiff itself was forced to admit, the instant Debtor was very credible. She frankly admitted her misstatements regarding her employment status, with no alibis. *But see* page 882 *supra* (this issue is found not significant here). She also indicated that she had lost all of her own funds through her confidence in Brown. Perhaps she was blinded by affection towards her intended marital partner, but she obviously believed Brown.

Furthermore, the Debtor's past knowledge of Brown's comfortable financial status gave her confidence of the truth of his representations some degree of objective justification. Even at the trial in issue, she talked of filing a suit against Brown, with the hope of reaching assets which she still believes he may have. While this issue is a relatively close one, we are not prepared to find that the

Debtor had reason to know that repayment from Brown was just wishful thinking and was not likely to be forthcoming at the time that she utilized the Plaintiff's cards.

## D. CONCLUSION

We therefore conclude that the Plaintiff was unable to present sufficient proof to satisfy the second and third of the five general criteria for § 523(a)(2)(A) proceedings by a preponderance of the evidence presented at trial. Judgment will therefore be entered in favor of the Debtor.[2],

---

2. The Debtor has not sought attorney fees pursuant to § 523(d) in her Answer to the Plaintiff's Complaint or otherwise to date. We have considerable doubts whether, even under the standards recently authored by this court in *In re Carr, Chevy Chase, FSB v. Carr,* Bankr. No. 94–15243DAS, Adv. No. 94–0843, 1994 WL 705228 (Bankr.E.D.Pa. Dec. 14, 1994); and *In re Woods,* 69 B.R. 999, 1001–04 (Bankr.E.D.Pa.1987), such an award would be forthcoming even if requested. In these most unusual circumstances, the Plaintiff's action appears substantially justified, at least from a legal point of view. Practically, though, it is unclear what hope the Plaintiff would have of collecting any nondischargeable debt from this destitute Debtor in any event.