**In re Gil ELISADE, Debtor.**

**No. 93–05211.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Sept. 21, 1994.

Stephen Milbrath and Peter Hill, for debtor.

Michael Levin, for LSL Biotechnologies, Inc.

## MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.

At Orlando, in said District on the 15th day of August, 1994, before Arthur B. Briskman, Bankruptcy Judge. Stephen Milbrath and Peter Hill appeared for the Debtor. Michael Levin appeared for LSL Biotechnologies, Inc.

Debtor seeks confirmation of his Chapter 13 plan pursuant to 11 U.S.C. § 1325. LSL Biotechnologies, Inc. moved to dismiss.

## FINDINGS OF FACT

The Debtor, Gil Elisade, filed for relief under Chapter 13 of the Bankruptcy Code on October 27, 1993. The Debtor and LSL Biotechnologies, Inc. ("LSL") had been engaged in Federal District Court litigation for over two years prior to that filing. The trial was calendared to begin on November 1, 1993. Limiting any liability to LSL that might arise from the litigation was the Debtor's avowed purpose in filing his petition to receive a superdischarge pursuant to 11 U.S.C. § 1328.

LSL sells BR–84 tomato seeds for which it claims to have a legitimate patent. LSL further contends that, other than itself, only Sun World International, Inc. can market BR–84 in the United States and Mexico. In 1990, LSL first suspected that the Debtor, mainly through his company Agricultural Seed Technology, Inc., was purchasing BR–84 through Hazera, Inc. and reselling them in North America. Their suspicion solidified over time until, in July 1991, LSL maintains that it wrote the Debtor requesting he cease and desist all BR–84 resales or face litigation. On August 13, 1991, the Debtor sought to have LSL's patent over BR–84 tomato seeds declared invalid in the United States District Court for the Middle District of Florida. LSL counterclaimed alleging patent violation, unfair competition, and tortious interference with a business relationship. LSL seeks damages in excess of $62,000,000.

Throughout the course of the District Court litigation, the Debtor was deposed numerous times on several key issues. The first of which is whether the Debtor realized the LEE–814 seeds he sold were in fact BR–84 seeds. The second of which is the nature of the Debtor's relationship to a company named Y.G. Lee Zaden, Inc.

### I. Seed Identity

On March 26, 1992, Debtor testified that he had neither knowledge of or reason to believe LEE–814 seeds were BR–84 seeds.

Q. Is there anything that has ever happened to you in your life, anything you have seen, heard, person that you have talked to, anything that might lead you to believe that the LEE–814 is, in fact, BR–84?

A. No.

Six months prior to this deposition the following transpired before District Court during argument regarding Preliminary Injunction Motions:

The Court: You are stating these are not LSL seeds.

Mr. Kay [Debtor's previous counsel]: Yes, your Honor. We believe that the evidence supports that they are not LSL seeds.

On May 12, 1992, documents were seized from Debtor's home pursuant to a civil sei-

zure order. The documents were orders placed by the Debtor for BR–84 seeds. They were either in his own handwriting or prepared under his direction. Debtor subsequently testified that he believed the LEE–814 seeds were BR–84 seeds.

Q. ... You knew one hundred percent no doubt about it that all the LEE–814 seeds were BR–84, there was no doubt in your mind ... that all LEE–814 seeds were BR–84, isn't that right?

A. I believed so but since there was no label on the bags I couldn't ever be one hundred percent sure.

Q. You knew, there was no doubt in your mind that every tomato seed you received ... was a Hazera tomato seed?

A. Yeah, I believe so and this was the information I had. I was sure that it was BR–84. That's what I asked and wanted ...

The Debtor further testified that he had specifically requested unlabeled bags. According to the Debtor, this was necessary to conceal the fact that it was BR–84 seeds being transferred into the United States.

## II. Y.G. Lee Zaden, Inc.

On March 26, 1992, Debtor testified that Zaden was a consulting company with which he paid $100,000 for the guidance they provided over the phone and with no accompanying paperwork or report. He claimed that his familiarity with the company was extremely limited.

Q. Who referred you to them?

A. I think through a magazine.

Q. Did you ever meet anyone from this consulting company personally?

A. No.

Q. Did you do anything to explore the company other than reading about them in a magazine?

A. No.

On May 13, 1992, just one hour before the deposition of his business advisor, John Scussel, the Debtor testified that "I [Debtor] gave him the name Lee–Zaden" for the company Scussel was creating for the Debtor. According to the Debtor, "Lee is taken from my daughter's name and Zaden ... in Dutch is seeds." The Debtor also acknowledged receiving the bank statements for Zaden.

On May 14, 1992, the Debtor's attorney received a $50,000 check from Zaden to defray his legal bills. Debtor stated the check "might be" in his handwriting.

On November 12, 1993, Debtor filed a Statement of Financial Affairs in which he claimed stock ownership, "of uncertain amount," in Zaden.

Debtor had more than ample opportunity both through written memoranda and during hearings to shed light upon what he conceded are "arguably inconsistent" statements on these two issues. Rather than address what are patently contradictory statements, the Debtor chose repeatedly to assert his Constitutional Right against self-incrimination.

The Debtor maintains that the apparent inconsistency between his March and May 1992 responses arose from a combination of the absence of an interpreter and the vague questions and responses during the March deposition.[1] The Debtor's native language is Hebrew. The Court is unpersuaded. The exchange on these issues was unambiguous. No clarification was requested at the time. Since that time, even when an interpreter is provided, the Debtor himself often answers the questions in English. He communicates with his attorneys, many business associates, and wife in English.

Another issue throughout the course of the District Court litigation is the Debtor's alleged continued participation in BR–84 seed sales during that time. Approximately one month after the District Court suit was filed,

---

1. Debtor also alleges ineffective counsel but he fails to elaborate other than to criticize prior counsel's not providing an interpreter.

LSL received a preliminary injunction prohibiting the Debtor from directly or indirectly engaging in BR–84 seed sales. On May 11, 1992, the District Court entered an order granting emergency relief for the enforcement of the preliminary injunction. This relief took the form of the May 12, 1992 civil seizure order referenced earlier. LSL filed a Motion for Contempt in September 1992 based on the Debtor's alleged violation of that injunction. At the time the Debtor filed for bankruptcy protection, the District Court had not yet considered the Motion for Contempt.

LSL moves to dismiss for lack of good faith with allegations including the Debtor perjured himself regarding (1) the true identity of LEE–814 seeds as BR–84 seeds and (2) his relationship to Y.G. Lee Zaden.

### CONCLUSIONS OF LAW

Bankruptcy Court is a court of equity. As such, it is guided by the equitable maxim, "he who seeks equity must do equity." *Manufacturers' Finance Co. v. McKey*, 294 U.S. 442, 448, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935). The Bankruptcy Code itself explicitly reinforces this equitable principle. Title 11 USC § 1325(a)(3), requires a showing of "good faith" on the part of the debtor as a prerequisite to plan confirmation. The importance of this requirement cannot be overstated. Bankruptcy courts have the "*inherent* right" to demand "good faith or clean hands" of their debtors. *In re Hurdle*, 11 B.R. 304, 306 (Bankr.E.D.Va.1981). "[G]ood faith is a discrete and paramount test." *In re Warren*, 89 B.R. 87, 94 (Bankr. 9th Cir. 1988).

Good faith is determined on an "*ad hoc* basis" with the courts approach remaining "flexible." *In re King*, 131 B.R. 207, 209 (Bankr.N.D.Fla.1991). Neither the Bank-

ruptcy Code itself nor the legislative history explicitly defines "good faith." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982). Nonetheless, the nature of that confirmation requirement has been clarified through case law. The burden of proof to demonstrate "good faith" lies with the debtor. *In re Wall*, 52 B.R. 613, 616 (Bankr.M.D.Fla.1985). That burden further increases if a Chapter 13 "superdischarge" petition is sought. *Id.*[2]

In evaluating whether the Debtor has met his burden, the Court must launch a "broad judicial inquiry into the conduct and state of mind of the debtor in proposing a plan." *Id.* Under this totality of circumstances analysis, both pre- and post-petition conduct are properly scrutinized. *Id.* It is unnecessary to specifically link improper pre-petition conduct to improper post-petition conduct for the former to be considered relevant. *In re Love*, 957 F.2d 1350, 1359 (7th Cir.1992). Pre-petition conduct can be so objectionable as to independently rise to the level of demonstrating lack of good faith. *In re Jones*, 119 B.R. 996, 1003 (Bankr.N.D.Ind. 1990).

*In re Northwest Place Ltd.*, 108 B.R. 809 (N.D.Ga.1988) articulates the specific principles which guide a good faith inquiry.

At the root of any definition is a debtor's respect for the underlying goals and policies encouraged by bankruptcy law. Bad faith filing of a bankruptcy petition involves using the process in such a way that the underlying policy of securing an orderly and *fair* adjustment of the relationship between debtor and creditors cannot be realized. *Id.* at 815.

Central to "fair" dealings between debtor and creditors is candor. *See, e.g., In re Waldron*, 785 F.2d 936, 941 (11th Cir.1986); *Memphis Bank & Trust Co. v. Whitman*, 692

---

**2.** "The chapter 13 discharge extends to all debts provided for by the plan, with but a few limited exceptions." 5 *Collier on Bankruptcy* (15 ed. 1988) ¶ 1328.01 at page 1328. None of the narrow exceptions are applicable in this case. Furthermore, many debts nondischargeable under

Chapter 7, including willful and intentional torts, are both dischargeable under Chapter 13 and not on their face indicative of lack of good faith. *In re Estalella*, 101 B.R. 391, 392 (Bankr.S.D.Fla. 1989).

F.2d at 432, *In re May*, 12 B.R. 618 (Bankr. N.D.Fla.1980). Lack of candor, which evinces an "intent to abuse the judicial process," is a basis for non-confirmation of a plan. *Albany Partners, Ltd. v. Westerbrook (In re Albany Partners)*, 749 F.2d 670, 674 (11th Cir.1984).

The Debtor's lack of candor throughout the District Court litigation regarding his knowledge of the true identity of the seeds in question and his relationship to Zaden, without more, provides sufficient grounds for dismissal of the Chapter 13 petition. The former issue was at the crux of LSL's claims against the Debtor. The latter issue was, among other things, central to an LSL's Contempt Motion. This court will not permit, let alone reward, such duplicity.

■■■ The Debtor's declared purpose in filing the Chapter 13 was to receive a super-discharge satisfying any obligations arising from the District Court litigation. The trial was scheduled to begin just days after the Chapter 13 filing. The Debtor's motivation, extrication from litigation, is not, in itself, indicative of lack of good faith. The Court fully recognizes that litigation expenses often contribute to the legitimate need to file for bankruptcy relief. The Court also recognizes, however, that "the liberal provisions of Chapter 13 are subject to abuse." *In re Norman*, 162 B.R. 581, 583 (Bankr.M.D.Fla. 1993) *citing Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982).

This finding of lack of good faith is based on Debtor's desire to utilize a Chapter 13 to conclude litigation whose integrity he had undermined and whose length he had unnecessarily extended through his dissemblance. The Bankruptcy Court is not a refuge for a Debtor to sort out ailing financial affairs resulting from litigation expenses when the Debtor, as litigant, unjustly thwarted a creditor's right to fair dealings.

■■■ Allowing such conduct by debtors to stand without any legal repercussions would provide debtors a perverse incentive, or at minimum no disincentive, to subvert the legal process in hopes of prevailing over an opposing party. For if the misconduct fails to achieve its purpose, the Debtor could still short-circuit the litigation through filing a Chapter 13. The Debtor has chosen to assert his Fifth Amendment right on these issues. "[T]he invocation of the Fifth Amendment by a party in a civil proceeding is subject to the drawing of an adverse inference by the trier of fact...." *In re McGinnis*, 18 B.R. 525, 527 (Bankr.N.D.Ga.1982). Given that the questions to which the Debtor asserted his Fifth Amendment privilege are material to the Court's good faith determination, a strong negative inference is drawn as to the Debtor's fair dealing with creditors. Such a negative inference does not violate the Debtor's rights. *Id.*

■■■ A debtor does not have a constitutional right to receive a discharge of his bankruptcy. *In re Connelly*, 59 B.R. 421, 448 (Bankr.N.D.Ill.1986) *citing United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). As such, when a debtor is faced with the possibility that continued assertion of the Fifth Amendment may contribute to dismissal of his bankruptcy petition, he is not being required to "forfeit one constitutionally protected right as the price of exercising another. *Id. citing Lefkowitz v. Cunningham*, 431 U.S. 801, 807–808, 97 S.Ct. 2132, 2136–37, 53 L.Ed.2d 1 (1977). Moreover, the Courts must require a debtor respond to all issues germane to the crucial good faith analysis if creditors rights are to be adequately protected.

Candor at one's convenience is a lack of candor. Equally self-evident is that the integrity of the bankruptcy system depends upon the scrupulous participation of its debtors. When a debtor's degree of forthrightness evinces a lack of good faith, the Court is duty bound to dismiss the debtor's petition. Invocation of the Fifth Amendment will not deter a court's good faith inquiry. It may, however, contribute to the court's final determination.

Accordingly, the Debtor did not file his petition in good faith and the case is due to be dismissed.

## ORDER

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is

**ORDERED, ADJUDGED and DECREED** that Debtor's plan was not filed in good faith pursuant to Title 11 U.S.C. § 1325(a)(3); it is further

**ORDERED, ADJUDGED and DECREED** that LSL Biotechnologies, Inc.'s Motion to Dismiss is **GRANTED;** and it is further

**ORDERED, ADJUDGED and DECREED** that the Chapter XIII case of Gil Elisade is hereby **DISMISSED.**