**In re William A. BAIRD p/d/b/a The Baird Company, Debtor.**

**Bankruptcy No. 97–06667–3P3.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

May 25, 1999.

S. Hunter Malin, Internation Distribution Systems, Inc., for plaintiff.

Christoper R. Demetros, for debtor.

Terrance E. Schmidt, for Susan Baird, Interested Party, defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case came before the Court upon the Chapter 13 confirmation hearing of William A. Baird ("Debtor") p/d/b/a The Baird Company. International Distribution Systems, Inc. ("IDS"), a creditor, objected to confirmation on the grounds that the plan was not proposed in good faith as required by 11 U.S.C. § 1325(a)(3), the plan does not satisfy the disposable income test of 11 U.S.C. § 1325(b)(1)(B), Debtor's unsecured creditors would receive more through a Chapter 7 liquidation and that Debtor cannot make all payments under his proposed plan. After a hearing on January 14, 1999, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT[1]

1. IDS is a trade association that negotiates freight prices for its various members. In promoting this endeavor, IDS contacted Debtor, an officer and controlling shareholder of Total Logistics Management Services, Inc. ("TLM") to discuss transportation discounts.

2. On or about January 25, 1994, IDS and TLM entered into a supplier agreement, which incorporated prior correspondence, that provided TLM would audit freight bills, and charge and act as liaison in negotiations with carriers for IDS' members.

3. TLM performed its responsibilities to IDS for two years.

4. Over time, TLM failed to perform its obligations under the supplier agreement.

5. IDS members paid $86,020.49 to TLM which was not forwarded to motor carriers to pay IDS members' invoices. Instead, Debtor used the money he received from IDS members to pay TLM's operating expenses, other clients' motor carrier bills, Debtor's own company's debts ("The Baird Company") and himself. (IDS' Ex. 24 at pp. 24–25, 68–70, 77; Tr. at pp. 149–150.)

6. Moreover, the supplier contract called for TLM to pay a cost justified discount of five percent (5%) of the net invoiced amount of all TLM billings to IDS distributors, with eighty percent (80%) of the rebate to be paid to IDS and twenty percent (20%) to TLM.

7. The evidence shows that TLM did not forward any portion of the 1995 fourth quarter rebate check for $13,232.89 to IDS. IDS was entitled to $10,586.32 of that amount. Thus, the total unpaid sums owed to IDS by TLM is $96,606.81.

8. On or about November, 1996, Debtor entered into an employment contract with Freight Solutions, Inc., for the purchase of The Baird Company. Under the

---

[1] The parties orally stipulated at the January 14, 1999, confirmation hearing that the Court may utilize the evidence previously presented on IDS' Motion to Dismiss for purposes of deciding whether confirmation is appropriate.

(Tr. at pp. 9–10.) Therefore, the Court adopts substantial portions of the Findings of Fact as enumerated in its decision in *In re Baird,* 228 B.R. 324, 326–27 (Bankr.M.D.Fla.1999).

employment contract, Baird was to receive $50,000.00, payable in five annual installments of $10,000.00.

9. On or about January, 1997, IDS filed a state court complaint against TLM and the Debtor individually. (Tr. at pp. 41–42.) The complaint alleges, among other things, conversion, breach of · contract, fraud and civil theft. The complaint seeks a total trebled damage claim of $289,820.40 pursuant to Florida's civil theft statute.

10. On June 19, 1997, Debtor, and on July 7, 1997, Susan Baird, Debtor's then-wife, executed a Settlement Agreement which was filed in their marriage dissolution case pending in state court. (IDS' Ex. 1.)

11. In the Settlement Agreement, Debtor agreed to relinquish substantially all of the marital assets to Susan Baird, including the right to receive the five $10,-000.00 installments from the ·sale of The Baird Company and his half interest in approximately $60,000.00 of equity in the marital home. Debtor also agreed to pay Susan Baird $1,000.00 per month alimony that was non-modifiable until the marital home was sold. The evidence indicates that this alimony was given to help Susan Baird pay the mortgage on the marital home until it was sold. The house was subsequently sold in March, 1998. (IDS' Ex. 23 at pp. 68–69.) Moreover, Debtor agreed to pay Susan Baird $600.00 per month as child support for their adult son. Debtor also agreed to assume a much. greater portion of the marital debt. The evidence indicates that Debtor was insolvent at this time. (IDS' Ex. 3; Tr. at pp. 53–54.)

12. On September 2, 1997, TLM filed a petition under Chapter 7 of the United States Bankruptcy Code.

13. On September 2, 1997, Debtor filed a petition for relief with this Court pursuant to Chapter 13. (Doc. 1.)

14. Debtor's plan calls for payments of $93.98 per month for thirty-six (36) months. (Doc. 13.) Debtor lists in his Schedule E an unsecured priority claim by the Internal Revenue Service in the amount of $2,100.00. Debtor lists in his Schedule F total unsecured claims of $149,079.32. Debtor's Schedule F indicates the portion of the unsecured claim attributable to IDS is in the form of a disputed claim in the amount of $83,000.00 for freight charges associated with the operation of TLM. (Docs.11, 13.) Moreover, Debtor's Schedule J shows his monthly expenses (without considering plan payment) exceeds his monthly income. (Doc. 11; IDS' Ex. 3.)

15. On June 5, 1998, Debtor lost his employment. On June 24, 1998, Debtor had a severe stroke and was hospitalized until November, 1998. Subsequent to Debtor's failing health, Debtor's son has timely paid all plan payments.

16. Debtor has never amended his schedules or Chapter 13 plan notwithstanding his unemployment and hospitalization.

## CONCLUSIONS OF LAW

IDS[2] seeks to have this Court deny confirmation of Debtor's Chapter 13 plan. IDS raises four objections to the plan.[3] (Doc. 170.) First, IDS claims that Debtor's plan was not proposed in good faith. More specifically, IDS argues that the Debtor's sole motivation for filing a Chapter 13 petition was to obtain a discharge of the Debtor's obligation to it, which it asserts would be nondischargeable under Chapter 7. Second, IDS contends Debtor's creditors would receive more in a Chapter 7 liquidation. Third, IDS claims Debtor

---

**2.** IDS members assigned their claims against Debtor to IDS.

**3.** The Court finds it necessary to comment on counsel for IDS' submission of a 49–page memorandum along with a 15–page Proposed Findings of Fact and Conclusions of Law. The Court finds such lengthy submissions to be superfluous and not in the interest of judicial economy.

has not dedicated all of his disposable income to making payments under the plan. Finally, IDS argues Debtor cannot make all payments under the plan. Debtor contends that the plan should be confirmed as meeting the requirements of § 1325.[4] (Doc. 171.)

Susan Baird, an interested party, submitted a Memorandum in Support of Confirmation of the Plan. (Doc. 172.) Susan Baird's main argument is that Debtor's pre-petition transfers to her were not fraudulently executed.[5]

▮ Chapter 13 was intended to enable an individual with regular income to develop and perform under a plan for the repayment of his debts for an extended period of time. *Jim Walter Homes, Inc. v. Saylors (In re Saylors)*, 869 F.2d 1434, 1436 (11th Cir.1989) (quoting H.R.Rep. No. 193, 86th Cong., 1st Sess. 2 (1959)). The advantage of Chapter 13 over Chapter 7 is that the debtor can retain his property while making regular payments to his creditors, and upon successful completion of the plan, obtain a broader discharge. *In re Wilson*, 168 B.R. 260, 262 (Bankr. N.D.Fla.1994). These differences were intended to encourage debtors to repay their debts, not avoid them through discharge. *Id.* The Chapter 13 discharge is reserved for the "honest, but unfortunate" debtor. *In re St. Laurent*, 991 F.2d 672, 680 (11th Cir.1993).

▮ Debtor bears the burden of proving that his proposed plan satisfies the six requirements for confirmation as set forth in 11 U.S.C. § 1325(a). *In re Humphrey*, 165 B.R. 508, 510 (Bankr.M.D.Fla.1994) (citing *In re Lindsey*, 122 B.R. 157 (Bankr. M.D.Fla.1991)). The Court will first address IDS' initial objection, the third requirement of § 1325.[6]

4. Debtor offered nothing more than conclusory statements of law concerning good faith. (*See* Tr. at pp. 11–17.)

5. Debtor and Susan Baird testified that the reasons for the transfers to her were for payments on account of an antecedent debt.

## I. Lack of Good Faith

▮ For a Chapter 13 plan to be confirmed, it must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3) (1999). The burden of proof to establish that a plan is proposed in good faith falls squarely on the Debtor. *In re Norman*, 162 B.R. 581, 583 (Bankr.M.D.Fla.1993); *In re Caldwell*, 895 F.2d 1123 (6th Cir.1990). Debtor's burden further increases if a Chapter 13 "super-discharge" is sought. *In re Petersen*, 228 B.R. 19, 24 (Bankr.M.D.Fla.1998) (citations omitted). "[W]hile the debtor bears the ultimate burden of proof on the [good faith] issue, to the extent that a creditor preemptively can demonstrate an absence of good faith, or the affirmative presence of bad faith, it will enjoy a valid objection to confirmation." *In re Smith*, 196 B.R. 565, 572 (Bankr.M.D.Fla.1996) (quoting *In re Hutcherson*, 186 B.R. 546, 550 (Bankr. N.D.Ga.1995)).

▮ In conducting a good faith inquiry, the Court must consider the totality of the circumstances. *Humphrey*, 165 B.R. at 511 (citing *In re Jones*, 119 B.R. 996 (Bankr.N.D.Ind.1990)). The Eleventh Circuit in *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens)*, 702 F.2d 885 (11th Cir.1983), delineated a nonexclusive list of factors that courts should use in making the good faith determination. The factors are:

(1) the amount of the debtor's income from all sources;

(2) the living expenses of the debtor and his dependents;

(3) the amount of attorney's fees;

(4) the probable or expected duration of the debtor's Chapter 13 plan;

However, little credible evidence was introduced to support this contention.

6. Based on the conclusions below, the Court need not and will not address IDS' remaining three objections.

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) the frequency with which the debtor has sought bankruptcy protection;

(10) the circumstances under which the debtor has contracted his debts and has demonstrated bona fides, or lack of same, in dealings with his creditors;

(11) the burden which the plan's administration would place on the trustee;

(12) any exceptional circumstances in the case;

(13) the type of debt and whether it would be nondischargeable in chapter 7; and

(14) the accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court.

*Id.* at 888–89. No one factor disposes of this Court's inquiry. Rather, the Court is to utilize all relevant factors to determine whether the Debtor has "abused the spirit of the Code or abrogated any of its provisions." *In re Smith*, 196 B.R. at 572. Therefore, the Court must consider all circumstances regarding Debtor's pre-petition activity and filing of the case when making the good faith determination. *In re Smith*, 848 F.2d 813 (7th Cir .1988).

**A. Debtor's motivations and sincerity in seeking Chapter 13 relief**

█ Evidence that a petition was filed to delay or frustrate the legitimate efforts of creditors to enforce their rights is an important factor in this Court's good faith analysis. Generally, when a petition is filed as a litigation tactic, courts routinely dismiss the case for a lack of good faith. *See Petersen*, 228 B.R. at 24, n. 4 (listing cases dismissed when filed to thwart lawsuit). Debtor testified that the reason he filed for bankruptcy relief in September, 1997, was because of the IDS lawsuit. (Tr. at pp. 41–42.) Although Debtor did not file for bankruptcy protection immediately after the IDS lawsuit was filed, Debtor did engage in action that considerably diminished his estate. More specifically, in June and July, 1997, Debtor and his then-wife Susan Baird, entered into a Settlement Agreement and subsequent Final Divorce Decree,[7] which provided for the transfer of all material marital assets from Debtor to Susan Baird. (Tr. at pp. 25–26.) Debtor transferred his interest in the sale proceeds from The Baird Company to Susan Baird, even though the proceeds were intended to be used to pay Debtor's creditors. (IDS' Ex. 5; Tr. at pp. 23–25.) Additionally, Debtor agreed to pay approximately one-third of his net income each month in alimony to Susan Baird. (IDS' Exs. 1, 3.) Further, Debtor agreed to pay $600.00 each month to Susan Baird as child support for their twenty (20) year old adult son. (IDS' Ex. 2, 23; Tr. at pp. 43–44.) Two weeks after the Final Judgment of Dissolution of Marriage was entered, Debtor filed the instant Chapter 13 bankruptcy action. (IDS' Ex. 7; Tr. at p. 62.) Based on the evidence presented, the Court finds that Debtor's primary purposes for filing were to impede IDS' state court lawsuit that had been filed in January, 1997, and attempt to greatly diminish IDS' recovery on its claim.

Additionally, Debtor did not file Chapter 13 to extend the payment of an arrearage owed on a secured asset or to save his personal property. In fact, according to Debtor's bankruptcy schedules, very few assets would be subject to Chapter 7 liquidation.[8] Further, in light of the very small

---

**7.** The Court finds it necessary to note that Debtor was not represented by counsel in the divorce proceeding and did not object to or question the Settlement Agreement. (Tr. at p. 48.)

**8.** On his petition, Debtor lists $1078.00 in nonexempt property. The Court finds this

plan payment to unsecured creditors, Debtor certainly did not file in an attempt to pay his creditors. *See Warren,* 89 B.R. at 92 (noting Chapter 13 benefit to creditors is self-evident; their losses will be significantly less than if their debtors opt for straight bankruptcy). As stated previously, Chapter 13 was intended to encourage debtors to repay their debts, not avoid them through discharge. *Wilson,* 168 B.R. at 262. Moreover, Debtor's questionable pre-petition transfers that severely diminished his estate illustrate his obvious disregard of the purpose and spirit of Chapter 13, and raise serious questions concerning his motivation and sincerity in seeking Chapter 13 protection. *See Warren,* 89 B.R. at 92 (stating primary purpose of being Chapter 13 debtor is to retain assets while repaying creditors).

**B. Debtor's degree of effort, duration of plan, ability to earn, type of debt and whether it would be nondischargeable in Chapter 7, and potential fluctuations in earnings'**

 As the 11th Circuit has noted, plan length and the portion of debt to be repaid under a plan are relevant to the determination of good faith. *Kitchens,* 702 F.2d at 888–89. While good faith does not require a plan of greater duration than the 3–year statutory minimum, it remains a factor the Court must consider in its good faith analysis. *Humphrey,* 165 B.R. at 511. Nevertheless, some courts have found that a debtor's failure to propose a plan of longer duration indicates a lack of good faith when the debtor is seeking to discharge an otherwise nondischargeable debt. *See, e.g., Wilson,* 168 B.R. at 263 (seeking discharge of claim for conversion of former wife's money). Also, while a small payout does not permit the presumption that the plan was filed in bad faith, *In re Weisser,* 190 B.R. 453, 455 (Bankr. M.D.Fla.1995), it remains a factor the Court must consider in its totality of the circumstances good faith inquiry. *Kitch-*

*ens,* 702 F.2d at 888. *See In re Dant,* 9 B.R. 117 (Bankr.E.D.Va.1981) (refusing confirmation because small payment unreasonable and indicative of bad faith); *In re Caldwell,* 895 F.2d 1123 (6th Cir.1990) (finding bad faith when plan sought to repay 36.6% of debt that would be nondischargeable in Chapter 7); *In re Dillon–Bader,* 131 B.R. 463, 465 (Bankr.D.Kan. 1991) (holding plan with small pay out for nondischargeable Chapter 7 debt not proposed in good faith); *In re Kourtakis,* 75 B.R. 183, 187–88 (Bankr.E.D.Mich.1987) (same).

Debtor schedules an unsecured priority claim to the Internal Revenue Service in the amount of $2,100.00. Debtor's Schedule F indicates a total unsecured claim of $149,079.32 with the portion attributable to IDS in the form of a disputed claim in the amount of $83,000 for freight charges associated with the operation of TLM. The Court previously found the amount owed by TLM to IDS more closely approximates $96,606.81. Debtor's plan calls for payments of $93.98 per month for a period of thirty-six months, the statutory minimum. Out of the total plan payment, $58.34 per month is to be paid out to the Internal Revenue Service on its claim. After the trustee's fees are paid, $30.00 per month is left over for payment to unsecured creditors. The majority of the scheduled debt (approximately 56%) is unsecured debt related to the litigation with IDS in state court. Under Debtor's plan, IDS will receive only a miniscule amount on their claim. When considering IDS' claim at $96,606.81, Debtor's plan will only pay approximately 0.72% of his unsecured creditor's claims.

 Moreover, IDS introduced ample evidence showing that the Debt owed to IDS by TLM is based on fraud, conversion and civil theft, and thus, would be nondischargeable under Chapter 7. This Court also now finds that IDS introduced ample evidence of Debtor's wrongdoing associat-

amount unlikely in light of Debtor's question-

able pre-petition transfers.

ed with the IDS–TLM business transactions to support a finding of personal liability on his part for this debt. (IDS' Ex. 24 at pp. 24–25, 68–70, 77; Tr. at pp. 49–50.); *see P.V. Constr. Corp. v. Kovner*, 538 So.2d 502 (Fla. 4th Dist.Ct.App.1989) (holding corporate officer liable for tort committed even when not done in furtherance of corporation); *Orlovsky v. Solid Surf, Inc.*, 405 So.2d 1363 (Fla.App.4th Dist.Ct.1981); *In re Tarrant*, 84 B.R. 831, 833 (Bankr. M.D.Fla.1988) (holding officer selling "out of trust" is personally liable if responsible for day to day operations of corporation); *In re Hyers*, 70 B.R. 764, 766 (Bankr. M.D.Fla.1987) (holding officer individually liable for conversion without need to pierce corporate veil). In fact, Norman Stringfield, Debtor's former business partner, testified at the confirmation hearing that Debtor converted IDS' money to his own use, used IDS money to pay for things other than IDS Member invoices, and transferred money from TLM to pay for The Baird Company's debts. (Tr. at pp. 146–150.) Chapter 13 is intended to encourage debtors to repay their debts, and is reserved for the "honest, but unfortunate" debtor. *St. Laurent*, 991 F.2d at 680. It is not intended as an avenue for a debtor to avoid a debt through discharge. *Id.* A Chapter 13 plan serving no purpose other than the discharge of an otherwise nondischargeable debt by a debtor not in need of Chapter 13 relief should be denied for lack of good faith. *Ohio Student Loan Com'n v. Willis (In Matter of Willis)*, 24 B.R. 293, 294 (Bankr.S.D.Ohio 1982).

In addition to the extremely low payment over the minimum statutory period for a Chapter 13 plan, the Court finds Debtor to have the potential to substantially increase his pay out to creditors over the life of the plan. Debtor's plan does not take into account an increase in payment to creditors upon termination of the alimony or child support payments. Susan Baird even testified that the alimony payments were only to be made until the marital house was sold. (IDS' Ex. at pp. 68–69.) Moreover, Debtor's son is due to graduate this year and will no longer be in need of the 50% contribution from his father for college tuition and living expenses. In fact, at the confirmation hearing Debtor's son testified that in light of him receiving financial aid and summer employment, he no longer needs the child support money. (Tr. at pp. 131–139, 142.) Further, Debtor's son is currently funding Debtor's plan. There was conflicting testimony regarding whether, in fact, the alimony and child support had been paid past June, 1998. Susan Baird and Debtor's son testified that the payments had ceased in June, 1998.[9] Debtor testified that the payments were made after June, 1998. Regardless, prior to Debtor's failing health and subsequent loss of employment, Debtor was earning approximately $50,000.00 annually. At the confirmation hearing, Debtor appeared to have regained much of his health and now, according to his testimony and Memorandum, is hopeful of gaining employment in his area of his expertise in the near future. (Tr. at p. 15; Doc. 171.) Debtor has never amended his schedules to reflect any of these changes. Based on the foregoing, the Court finds Debtor in a position to substantially increase his payment to creditors throughout the life of his plan.[10]

---

9. The Court notes that, based on the testimony, the alimony payments continued for at least two months after the marital residence was sold. This amount constitutes more than Debtor proposes to pay his unsecured creditors over the life of the plan.

10. While it seems contradictory to note that Debtor can afford to pay more to his creditors throughout the life of his plan when his son is currently funding the plan, the Court is forced to rely on the plan as provided in the schedules along with its accompanying income stream and expenses. Debtor has failed to amend his schedules since falling ill and becoming unemployed. *See In re Clements*, 185 B.R. 903, 907 n. 1 (Bankr.M.D.Fla.1995) (noting court forced to rely on debtor's schedules because not amended prior to confirmation hearing). Moreover, the evidence indicates that Debtor is currently in position to obtain

## *CONCLUSION*

When viewing the circumstances in total, the Court concludes that the plan was not proposed in a sincere effort to repay debts over a reasonable period of time, but rather, was proposed as a vehicle for evading IDS' state court lawsuit. Moreover, Debtor's lack of effort, extremely low pay out to unsecured creditors, ability to pay creditors more throughout the life of the plan, and likelihood that his debt to IDS would be nondischargeable in Chapter 7 support

the Court's conclusion that Debtor's plan was not proposed in good faith. The proposed plan is an abuse of the purpose and spirit of Chapter 13, and thus, IDS' Objection to Confirmation is well taken, and confirmation is denied.

comparable employment in his field of expertise.