**In re David Randolph YORK, Jr., Debtor.**

**No. 01–11208–JDW.**

United States Bankruptcy Court, M.D. Georgia, Albany Division.

July 1, 2002.

George W. Woodall, Albany, Georgia, for debtor.

Deena Plaire–Haas, Albany, Georgia, for SunTrust Bank.

Timothy O. Davis, Albany, Georgia, for Albany Bank & Trust.

Kristen Smith, Columbus, Georgia, Chapter 13 Trustee.

### MEMORANDUM OPINION

JAMES D. WALKER, Bankruptcy Judge.

This matter comes before the Court on objections to confirmation filed by Albany Bank & Trust and SunTrust Bank alleging lack of good faith by Debtor, David York, Jr. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). The Court held hearings on February 19, 2002, March 25, 2002, and April 22, 2002, during which the parties presented evidence. After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Prior to filing bankruptcy, Debtor had interests in several businesses, including Quality Land Improvement, Land Improvements, Inc., and Your Buds Land Improvement. In addition, Debtor had been an officer of, but not a shareholder in, Tri–State Trailer Sales. Quality Land Improvements was a timber improvement operation in which Debtor was in partnership with James Williams. Your Buds Land Improvement initially was a sole propri-

etorship involved in landscaping. Land Improvements, Inc. was a corporation created by Debtor, which subsequently began doing business as Your Buds Land Improvements.

On March 5, 2001, Debtor executed a promissory note on behalf of Land Improvements, Inc. in favor of Albany Bank & Trust ("AB & T") in the amount of $48,130. Debtor personally guaranteed the note. Debtor told Paul Joiner, a loan officer with AB & T, that his business had been awarded a contract to do landscaping work for the city of Albany ("the City"). AB & T sought an assignment of the contract as collateral for the note.

Debtor and Mr. Joiner signed an assignment agreement that referenced contract number 00–136 between the City and Land Improvements, Inc.; their signatures were witnessed and notarized. One signature line was left blank for the City's acknowledgment of the contract. Mr. Joiner mailed the agreement to Yvette Fields, purchasing manager for the City.

Upon receiving the agreement, Ms. Fields contacted Mr. Joiner to inform him that Debtor did not have contract number 00–136 with the City. On the same day, Debtor sought a distribution of the note, and Mr. Joiner refused, explaining the problem to Debtor. Debtor told Mr. Joiner it was a mistake and said he would straighten it out with the City. Later that day, Debtor returned to Mr. Joiner with the original assignment agreement and a set of bid documents with contract number 01–092 on them.

The acknowledgment line for the City on the assignment agreement bore the signature "Willie Davis." Willie Davis was an employee of the City's Department of Economic and Community Development, with whom Debtor had worked before. Mr. Davis and Ms. Fields both testified that the signature was not Mr. Davis' signature and that he did not have authority to make such an acknowledgment on behalf of the City. Mr. Davis further testified that he did not sign the document. In addition, the contract number on the assignment had been marked out and replaced with the number 01–092, with the initials W.D. next to it. Mr. Davis testified that he did not alter the number or place his initials on the document. Ms. Fields testified that when she gave the agreement to Debtor, it had not been signed by anyone from the City. Debtor testified that when he received the assignment from Ms. Fields, it was in an envelope, and he did not look at it. He said that he did not see it signed by any employee of the City. He also testified that he placed no signature on the document other than his own and that he did not alter the document in any way.

Upon returning the assignment to Mr. Joiner, Debtor said the mix up was caused because the wrong contract number had been written on the assignment. With the assignment seemingly acknowledged by the City, Debtor received disbursements on the note. He later defaulted on his payments.

Debtor testified that he was performing work under contract number 01–092, but no actual contract had been executed. He testified that in his usual course of dealing with the City, he did not sign a formal contract, but rather worked off the bid documents. Ms. Fields testified that she later met with Mr. Joiner at her office, looked up contract number 01–092, and determined it had not been awarded to Debtor. Mr. Davis testified that Debtor had done some work for the City in early 2001, but he did not know what contract number was associated with the work, and Debtor had ceased working before the project was complete. Debtor said he quit working because some of his equipment was repossessed by SunTrust Bank.

Between January 12, 2000, and March 16, 2001, Debtor executed eleven promissory notes, either individually or in his capacity as owner of Quality Land Improvement, in favor of SunTrust. The bank's exposure in the transactions totaled approximately $450,000. The bank collateralized the debt with perfected security interests in numerous pieces of equipment used by Debtor in his various businesses.

After Debtor defaulted on the loans, SunTrust obtained a writ of possession in June 2001 and repossessed several pieces of the equipment. However, the bank was unable to locate all the collateral. David Lassiter, senior vice president and senior loan officer for SunTrust, and Joe Holt, commercial loan officer for SunTrust, met with Debtor on June 22, 2001, to discern the location of certain collateral. The parties dispute what Debtor said at that meeting and they dispute the location of collateral. The testimony of Mr. Lassiter, Mr. Holt, and Debtor for each piece of collateral at issue is as follows:

As to a John Deere 950 tractor, Mr. Lassiter and Mr. Holt testified that Debtor said he never owned it. Debtor denied saying this. He testified that the loan had been moved to a different bank, and SunTrust had been paid off.

With respect to a Weiss McNair B85 blower, Mr. Lassiter testified that Debtor said he sold it, but did not have the name and address of the buyer. Debtor testified that he traded the blower at Albany Tractor for a seed broadcaster and did so with the permission of Pam Simmons, who was an employee of SunTrust at the time. He also testified that he told SunTrust where the seed broadcaster was located, but the bank never repossessed it.

As to a Bush Hog pulverizer, Mr. Lassiter testified that at the June meeting, he asked Debtor the location of the pulverizer, and Debtor told him it was at the Rocking Horse Ranch (now Georgia Watermelon Growers) in Sylvester. Mr. Holt testified that when the bank spoke to the ranch owner, the owner told the bank he had never heard of Debtor and none of Debtor's equipment was at the ranch. Mr. Lassiter testified that although equipment similar to the pulverizer was located at the ranch, none matched the serial number of Debtor's pulverizer. The bank did not pursue the matter further. Debtor testified that the pulverizer was, and currently is, at Rocking Horse Ranch in the possession of Randy Finch. Debtor said he had been keeping the pulverizer at a cousin's house. He explained that Mr. Finch went to the house to pick up some other equipment and mistakenly took the pulverizer, as well. Debtor also said the owner of Rocking Horse does not know Debtor, but Mr. Finch does live on the property at Rocking Horse.

With respect to a Semco box blade, Mr. Lassiter and Mr. Holt testified that Debtor said he never owned it. Debtor testified that he did not deny ownership. He said that the equipment is in the backyard of his former home, which was foreclosed on by another bank and that he told SunTrust it was there, but the bank has not taken it. Mr. Holt testified that employees of SunTrust went to the house and looked around the yard and adjacent lot but were unable to locate any collateral on the property.

As to a 1984 Chevrolet flatbed truck, Mr. Lassiter testified that Debtor said he sold it to Sammy Smith. Debtor testified that he never told the bank he sold the truck, but he did tell SunTrust he traded the truck for services. Debtor says he has the truck back now, but it is still located at Mr. Smith's house. Mr. Holt testified that he went to Mr. Smith's residence and did not find the truck. Mr. Holt then called

Mr. Smith, who told Mr. Holt he had no property related to Debtor.

As to a 1995 twelve-ton Econoline backhoe pro trailer, Mr. Lassiter and Mr. Holt testified that Debtor said he never owned it. Debtor denied saying this. Debtor testified that he traded the Econoline for an Eager Beaver ten-ton trailer, and Sun-Trust financed the trade. Mr. Holt said the bank did finance an Eager Beaver that the bank successfully repossessed.

As to a 1999 Cato fuel line trailer and tank, Mr. Lassiter and Mr. Holt testified that Debtor told them James Williams had the equipment. The bank attempted to recover it, but has been unable to do so. According to Mr. Holt, Mr. Williams said he did not have the trailer. Debtor did not offer any testimony about this piece of equipment.

With respect to a 1999 Cato trailer, Mr. Lassiter testified that Debtor told him he had sold the trailer to someone in Texas. The bank does not know the buyer's name or the trailer's location and has been unable to recover the trailer. Debtor testified that he did sell the trailer. However, the trailer was among the inventory of Tri–State Trailer Sales. The bank had financed the trailer in Debtor's name, knowing that it would be resold in the ordinary course of Tri–State's business. When it was sold, the bank originated a second note to cover the outstanding debt remaining on the original note. Mr. Holt testified that he was not aware of the bank receiving any proceeds from the sale.

As to a 2001 Honda motorcycle, Mr. Lassiter testified that Debtor sold it to a relative and that Debtor said he would give the bank the name and address of the buyer. The bank has been unable to locate the motorcycle and never has received the proceeds from Debtor. Debtor testified that he had discussed his intention to sell the motorcycle with SunTrust employee Rick Stone. Mr. Stone did not object to the sale. When the sale was completed, Debtor gave the $6,500 in proceeds to Mr. Stone. Debtor also testified that he gave the bank the name of the purchaser, but not the address. Mr. Holt testified that Debtor did not offer any information at the June meeting about having given the proceeds to Mr. Stone.

As to a 1985 Mack truck, Debtor testified that it was sold to a buyer found by SunTrust for $15,000. Mr. Lassiter testified that the bank financed the sale and deposited the proceeds into Debtor's account. However, Debtor said he never saw or endorsed the proceeds check. A copy of the check entered as evidence shows no endorsement by Debtor. Debtor testified that he was unaware that it had been deposited in his account and that he did not know what became of the money. Counsel for SunTrust stressed the fact that Debtor did not immediately—indeed, did not ever—submit the proceeds to Sun-Trust. However, SunTrust was in control of the proceeds and chose to deposit it into Debtor's account rather than applying it toward his outstanding debt.

As to a Kubota M5400 tractor, Mr. Lassiter testified that Debtor said he never owned it. Debtor testified that the only Kubota he had ever owned was an M8200, which had been repossessed.

As to a Bush Hog loader, Mr. Lassiter testified that Debtor said he never owned the equipment and that the bank was never successful in locating it. Debtor testified that he had never owned a Bush Hog loader even though he had signed a financing statement pledging it as collateral. He stated it might be an attachment to another piece of equipment. Mr. Holt said the loader was attached to a Kubota M5400 tractor.

With respect to a JCB loader, Mr. Lassiter and Mr. Holt testified Debtor traded it for a new loader, but SunTrust had never released the collateral and never received any proceeds. Mr. Holt said he called the business where Debtor traded it, but the business had no records of the trade. Debtor testified that he sold the loader with the permission of SunTrust for approximately $20,000 and that he gave the proceeds to SunTrust which it says it never received.

Pam Simmons, a former loan officer with SunTrust, who had signed all the financing statements filed by SunTrust to perfect its security interests in the collateral at issue, testified that she never had given Debtor permission to sell any of the collateral, contrary to Debtor's testimony that she had approved certain sales. Ms. Simmons also testified that it had been approximately two or three years since she had seen Debtor's file at SunTrust. When questioned about the purchase of specific collateral, she was unable to recall details.

Debtor filed a Chapter 13 petition on July 2, 2001. He filed a Chapter 13 plan on July 6, 2001 that proposed a $3,000 dividend to unsecured creditors over a term of four years and nine months. On November 29, 2001, Debtor filed an amended plan that provided no dividend to unsecured creditors over a term of three years.[1] AB & T and SunTrust filed objections to confirmation alleging lack of good faith.[2]

## Conclusions of Law

Pursuant to Section 1325(a)(3) of the Bankruptcy Code, a Chapter 13 plan may not be confirmed unless it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C.A. § 1325(a)(3) (West 1993). Although the ultimate burden of showing good faith is on the debtor, if a creditor "preemptively can demonstrate an absence of good faith, or the affirmative presence of bad faith, it will enjoy a valid objection to confirmation." *In re Baird,* 234 B.R. 546, 550–51 (Bankr.M.D.Fla.1999).

Neither the Code nor the legislative history provides any specific standard or definition of good faith under Section 1325(a)(3). *Shell Oil Co. v. Waldron (In re Waldron),* 785 F.2d 936, 939 (11th Cir. 1986). Rather, the law requires the Court to consider the totality of the circumstances to determine whether a debtor has abused the provisions, purpose, or spirit of Chapter 13 in his plan proposal. *See Kitchens v. Georgia R.R. Bank & Trust Co. (In re Kitchens),* 702 F.2d 885, 888–89 (11th Cir.1983).

Kitchens provides a nonexclusive list of factors for courts to consider in the good faith analysis: (1) the amount of the debtor's total income; (2) his living expenses; (3) the amount of attorney fees; (4) the duration of the Chapter 13 plan; (5) the debtor's motivations and sincerity in seeking Chapter 13 relief; (6) his degree of effort; (7) his earning ability and its

---

**1.** Debtor has since filed another amended plan based on an anticipated increase in income that proposes a 20 percent dividend to creditors over 4 years and 9 months.

**2.** Although neither AB & T nor SunTrust has made a formal motion to dismiss, the Court entertains such motions as a matter of course along with objections to confirmation. The notice of bankruptcy sent out by the clerk of court states that if confirmation is denied, a motion to dismiss may be granted for cause. The Court stated several times during the confirmation hearing that if it found a lack of good faith, it would dismiss the case. In addition, when asked by the Court, counsel for AB & T and SunTrust said that if confirmation were denied, the banks wanted the case dismissed. Thus, the Court construes the objections to confirmation to include motions to dismiss.

likelihood of fluctuating; (8) special circumstances, such as inordinate medical costs; (9) the frequency with which the debtor has sought bankruptcy relief; (10) the circumstances of his dealings with his creditors; and (11) the burden of plan administration on the trustee. *Id.* at 888–89. Other factors courts appropriately consider are the debtor's prepetition conduct, *Baird,* 234 B.R. at 551; *In re Elisade,* 172 B.R. 996, 1000 (Bankr.M.D.Fla. 1994), and the debtor's honesty. *Waldron,* 785 F.2d at 939.

■ The confirmation hearing is a debtor's opportunity to seek approval of his plan and to demonstrate that it meets all the criteria for confirmation. "Lack of candor, which evinces an 'intent to abuse the judicial process,' is a basis for non-confirmation of a plan." *Elisade,* 172 B.R. at 1001 (quoting *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 674 (11th Cir.1984)). *See also Fawcett v. United States (In re Fawcett),* 758 F.2d 588, 589 (11th Cir.1985) (quoting *Johnson v. Vanguard Holding Corp. (In re Johnson),* 708 F.2d 865, 868 (2d Cir.1983)) (good faith requires the debtor to conduct himself with honesty "in the submission, approval, and implementation of a Chapter 13 bankruptcy plan").

■ In *Waldron,* the Eleventh Circuit Court of Appeals said that good faith under Section 1325(a)(3) requires the Chapter 13 debtor to file his petition with the honest intent to use Chapter 13 as a vehicle for reorganization of debt, not as a device for a "sinister" or "unworthy" purpose. 785 F.2d at 939 (quoting *In the Matter of Southern Land Title Corp.,* 301 F.Supp. 379, 428 (E.D.La.1968)). The court said,

> We hold that with section 1325(a)(3) Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its

intended purpose. Accordingly, *whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives. If the court discovers unmistakable manifestations of bad faith, ... confirmation must be denied.*

> Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.

> The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely require conduct consistent with the concepts of basic honesty.

*Id.* at 941 (emphasis added).

■ The factors on which the Court has placed the greatest weight in this case are the circumstances of Debtor's dealings with his creditors (subsumed within this factor are Debtor's honesty with his creditors and his prepetition conduct with respect to his creditors), Debtor's honesty to the Court during his confirmation hearing, and Debtor's motivations and sincerity in seeking Chapter 13 relief.

As to AB & T, Debtor acted fraudulently in contracting his debt to AB & T and lied under oath to the Court during his confirmation hearing. Debtor provided Mr. Joiner with a document containing a signature he knew was forged, knowing that Mr. Joiner would rely on the validity of that signature in extending credit. Debtor maintained under oath that he did not know how the signature appeared on the agreement. But the Court finds the testimony of Mr. Joiner and the disinterested testimony of Ms. Fields and Mr. Davis to be more credible than that of

Debtor, who wants to secure a discharge and could have a variety of reasons for wanting to conceal his complicity in the alteration of the assignment agreement.

The Court is convinced Debtor testified untruthfully with respect to the acknowledgment of the City on the assignment. Mr. Joiner testified that he mailed the original copy of the assignment agreement to Ms. Fields, and Ms. Fields testified that on the same day she received the agreement, she gave it to Debtor. When she gave it to Debtor, it was unsigned by the City. Because a signature purporting to be a representative of the City was affixed to the assignment agreement when Debtor presented the agreement to Mr. Joiner that same day, the Court must conclude that the signature was added while the agreement was in Debtor's possession.

By denying any knowledge of how the City's acknowledgment was placed on the agreement, Debtor has sustained a deception into the confirmation process that he began prepetition. Now, he is not only attempting to deceive a creditor, he is attempting to deceive the Court. A debtor who lies to a creditor to obtain financing and maintains that deceit through the confirmation process cannot be said to have proposed his plan in good faith by acting in a manner "consistent with the concepts of basic honesty." *Waldron,* 785 F.2d at 941.

The Court also has considered Debtor's behavior toward SunTrust. Although Sun-Trust was unable to produce the type of "smoking gun" evidence of fraud that AB & T did, the testimony presented on Sun-Trust's objection shows a pattern of evasiveness that strongly suggests deception by Debtor. Debtor sold collateral out of trust and failed to submit the proceeds to SunTrust, he repeatedly directed SunTrust to erroneous locations of collateral, and he gave convoluted, nonsensical explanations for the disappearance of collateral. Even during the confirmation hearing, he provided virtually no information that would be helpful to SunTrust in reclaiming its collateral.[3]

Debtor's lack of candor before the Court in response to AB & T and SunTrust's objections demonstrates his intent to abuse both the judicial process and the bankruptcy system. The Court refuses to effectively legitimize Debtor's tactics by approving his plan under these circumstances. The Court concludes that Debtor has failed to meet his burden to demonstrate that he filed in plan in good faith. Instead, the banks have shown that Debtor has engaged in a pattern of behavior repugnant to the bankruptcy system. A fresh start cannot be built on a foundation of deceit. Thus, the objections to confirmation are sustained, and Debtor's case is dismissed.

---

**3.** In addition, with respect to Debtor's motivations and sincerity in seeking Chapter 13 relief, the Court has considered that the debt owed to AB & T likely would be nondischargeable in Chapter 7. The evidence presented by AB & T is sufficient to make a prima facie showing of nondischargeability under § 523(a)(2) in that Debtor made a representation he knew to be false, with the intent of deceiving AB & T, on which AB & T relied and, as a consequence, sustained a loss. 4 Collier on Bankruptcy ¶ 523.08[1] (15th ed. revised 2002); 11 U.S.C.A. § 523(a)(2)(A)

(West 1993 & Supp.2002) ("A discharge under section 727 ... does not discharge an individual debtor from any debt—... (2) for money ... or an extension ... of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud."). Standing alone, such a motive would not be indicative of bad faith. However, when considered alongside Debtor's persistent deceit with respect to AB & T and his general evasiveness with respect to SunTrust, it serves as further evidence of Debtor's bad faith.